UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

GOVERNMENT EMPLOYEES INSURANCE       CASE NO.:  8:20-cv-00802-CEH-AAS
CO., et. al.,
     Plaintiffs,

v.

THERAPY CENTER OF TAMPA, L.L.C.,
LUIS RODRIGUEZ, IVETTE ULLOA,
MARIA RAMOS, L.M.T., et al.,
     Defendants.

_____/

## DEFENDANTS' AMENDED MOTION TO DISMISS PLAINTIFF'S COMPLAINT PURSUANT TO FED.R.CIV.PRO. 12(b)(6)

Defendants, Therapy Center of Tampa, LLC, Luis Rodriguez, Ivette Ulloa, and Maria

Ramos, L.P.T., (collectively "Tampa Therapy") by and through their undersigned counsel, do

hereby Move this Honorable Court pursuant to Federal Rule of Civil Procedure 12(b)(6) to

Dismiss Plaintiff's Complaint and in support thereof aver as follows:

### I.     GEICO FAILS TO STATE A PLAUSIBLE FRAUD CLAIM

Despite 1,606 pages of Complaint and Exhibits, GEICO fails to set forth a plausible

claim of fraud.  Once one cuts through its indiscriminate surplusage, the Complaint is revealed to

rest entirely on two threadbare, *purely legal* conclusions, one of which is woven out of whole

cloth by GEICO, and another which simply makes no sense on its face.

The legal conclusion manufactured by GEICO which is the main pillar of its pillory,

regards what level of supervision is legally required by medical doctors over "incident to"

services provided by nonphysician personnel before the doctor may bill for said services.  After

weaving through various state, federal, and secondary sources, GEICO announces that the

legally level required is "direct" and doctors must therefore be constantly physically present within the office while any such services are performed in order to bill for them.

The second legal conclusion underpinning GEICO's Complaint is just plain logically impossible. It posits that the records of treatment created by the Defendants so obviously reflected unreasonable and unnecessary care that anyone "legitimately" reviewing the records would have concluded immediately upon doing so that they were entirely fraudulent, *except for the GEICO PIP adjusters who paid for the treatment.*

Solely on the basis of these two legal conclusions, GEICO asserts 31 causes of action, each one of which is entirely premised on fraud.[1] As detailed below, however, GEICO's naked legal conclusions fail in all respects to serve as plausible bases for alleging intentional fraud, and each one of GEICO's causes of action therefore fail to state a claim as a matter of law.

## A.      LEGAL CONCLUSION #1: "DIRECT" SUPERVISION

GEICO alleges that Tampa Therapy violated Florida's Health Care Clinic Act (Fla. Stat. § 400.9935), because its Medical Director, Luis Merced, M.D., was not "legitimate" based on the conclusory accusations that he "never ensured that all health care practitioners at the clinic had active appropriate certification or licensure for the level of care being provided, never conducted systematic reviews of Therapy Tampa's billings to ensure that the billings were not fraudulent or unlawful, and never even made any attempt to discover the unlawful charges submitted through Therapy Tampa, much less take any immediate corrective action." (See ECF 1, ¶130).

However, the "facts" GEICO uses to support these allegations are circular and deliberately obfuscating (and of course, insultingly ageist). For instance, GEICO alleges that Dr.

---

[1] The Counts applicable to the Tampa Therapy are 1 and 20-25 and include a demand for Declaratory Judgment, federal and state RICO claims, FDUTPA, Common Law Fraud, and Unjust Enrichment. Each incorporates every prior allegation of the Complaint and is entirely premised on the accusation that Tampa Therapy committed fraud by submitting and receiving payment for knowingly false bills.

Merced was also the Medical Director at the other 4 clinics named as defendants, and describes all five clinics as located "throughout the Tampa area." See ECF 1, ¶132. This is an intentional bit of subterfuge designed to create imaginary support for what GEICO knows to be an otherwise invented legal conclusion.

The 5 clinics sued in this case are in actuality all within a few blocks of each other and easily accessible from one location to the next within mere minutes. GEICO's effort to paint them as geographically far-flung is obviously deliberate.[2] GEICO seeks to create a false impression of geographic distance because the plausibility of its legal conclusion is partially dependent upon such a misconception.

Cutting through its bluster, the heart of the Complaint's fraud allegations against Tampa Therapy is found in paragraphs 303-307. Therein, GEICO spins its tale of statutory divination, from Florida's PIP statute, to the Medicare Claims Processing Manual, to the Code of Federal Regulations. Through this self-serving hodge-podge of creative lawyering, GEICO patches together its legal conclusion of "direct supervision":

**303. As set forth above, the No-Fault Law's billing requirements provide – among other things – that all PIP billing must comply with the instructions promulgated by the Centers for Medicare & Medicaid Services for the completion of HCFA-1500 forms. See Fla. Stat. § 627.736.**

**304. All of the billing that the Therapy Tampa Defendants submitted through Therapy Tampa to GEICO, including the billing for putative physical therapy services, was submitted on HCFA-1500 forms.**

**305. As set forth above, pursuant to the instructions promulgated by the Centers for Medicare & Medicaid Services for the completion of HCFA-1500 forms, the name of the healthcare provider who actually performed or directly supervised the underlying physical therapy treatment must be listed on the HCFA-1500 form. See, e.g., Medicare Claims Processing Manual, Chapter 26 – Completing and Processing Form CMS-1500 Data Set.**

---

[2] The desire for an economy of words clearly was not the motive for failing to identify the street addresses of each facility.

**306. As set forth above, to "directly supervise" a physical therapy treatment, a physician "must be present in the office suite and immediately available to furnish assistance and direction throughout the performance of the procedure. It does not mean that the physician must be present in the room when the procedure is performed." See, e.g., Medicare Claims Processing Manual, Chapter 26 – Completing and Processing Form CMS-1500 Data Set, citing 42 C.F.R. 410.32.**

**307. Pursuant to the instructions promulgated by the Centers for Medicare & Medicaid Services for the completion of HCFA-1500 forms, to the extent that a physician is not actually "directly supervising" a physical therapy treatment, then the actual name of the person who is actually performing the physical therapy treatment must be listed on the HCFA-1500 form. See, e.g., Medicare Claims Processing Manual, Chapter 26 – Completing and Processing Form CMS-1500 Data Set.**

The rabbit in GEICO's hat is placed there in paragraph 305, wherein it simply pronounces that the various statutes, regulations and secondary sources to which it vaguely cites, *when taken together*, demand "direct" supervision and, further, that they collectively define "direct" supervision as being "present in the office suite." Upon this grand legal pronouncement, GEICO obsessively cuts and pastes allegations designed solely to show that Dr. Merced could not have been "in the office suite" as every service at issue was being performed at the 5 clinics sued.

Though GEICO tries to obscure reality with ridiculous repetitiveness, its *entire* allegation of fraud boils down to an accusation that Tampa Therapy committed fraud because Dr. Merced did not "directly" supervise the treatment billed. Every "fact" pleaded by GEICO is thus designed solely to show that it is unlikely Dr. Merced's level of supervision met the definition of "direct supervision" which GEICO claims is necessary.

This means, of course, that if the level of supervision required of a medical doctor over the "limited range of healthcare services" at issue in this case (ECF 1, ¶279) is not in fact required to be "direct", then GEICO has failed to plausibly allege even one single false representation (much less intentional fraud).

It is critical to note that by its pleading, GEICO concedes that Tampa Therapy's bills were entirely accurate if in fact Dr. Merced did provide the *appropriate* level of supervision. This is because GEICO acknowledges that every one of the records reflecting services provided by nonphysician personnel were signed and acknowledged to have been entirely provided by the nonphysician personnel who performed them. GEICO thus admits it could never have paid a bill for these services under the false impression that Dr. Merced had performed them personally. See ECF 1, ¶311. Therefore, when it paid Tampa Therapy's bills, GEICO can only reasonably have done so believing that Dr. Merced was providing the required level of supervision necessary for him to bill for the nonphysician personnel providing the services.

By the terms of GEICO's own Complaint, therefore, if Dr. Merced provided the legally required level of supervision, then all of Tampa Therapy's bills were perfectly accurate and GEICO has failed to allege even one false representation, rendering its fraud allegations obviously implausible.

But even if GEICO's self-serving legal conclusion is ultimately determined to be correct, its allegation of *knowing fraud* is still not plausible. This is because GEICO has, at best, alleged facts to support an inference that Dr. Merced did not provide "direct" supervision as defined by GEICO. GEICO has *not* plead *any* facts as to the level of supervision Dr. Merced *actually provided*. Therefore, if it is a reasonable interpretation of the pertinent law that something *other* than "direct" supervision permits a licensed physician to bill for certain services provided under his name by nonphysician personnel, then GEICO has failed to plausibly state a claim for intentional fraud.

As detailed below, it is in fact a reasonable interpretation of the complicated regulatory scheme which governs medical billing that a physician may bill under his name for "incident to"

services provided under his *general* supervision by nonphysician personnel.  Having alleged no facts to support an accusation that Dr. Merced did not provide *general* supervision over the services billed, GEICO has failed to set forth a plausible basis for fraud.

**B.      LEGAL CONCLUSION #2: FRAUD THAT IS OBVIOUS TO EVERYONE EXCEPT GEICO**

The other basis upon which GEICO alleges fraud, the one that just makes no sense, is that representations made by Tampa Therapy in its treatment notes were so obviously deficient in every respect that any objectively reasonable person reviewing them would have seen immediately that they were entirely fraudulent.  (See, e.g., ECF 1, ¶315-319).  The reason this makes no sense is that in paragraph 1,028(!) GEICO alleges that it was defrauded when it paid the bills because of the "facially-valid documents submitted to GEICO" by Tampa Therapy. Both of these allegations simply cannot be true.

A deeper dive into GEICO's accusations only adds to the confusion.  In paragraph 311(i-xv), GEICO lists "examples" of how Tampa Therapy's records "concealed" the identity of the person actually performing the 'limited range of health services" billed under Dr. Merced's name.  Yet, in every single one of these examples, GEICO admits that the therapy notes were signed by the person performing the service "in keeping with the fact that the pertinent services were performed" *by the person who signed them*.

What GEICO is alleging as fraudulent misrepresentation is really nothing of the kind. Rather, GEICO is alleging that it paid millions of dollars in bills without once ever looking at the documents submitted to support the billing.  GEICO is thus demanding that the Court accept as a reasonable standard of PIP claims adjusting (and consumer conduct in general) that insurers may blindly pay bills for years without reviewing any of the documentation submitted along with them yet still be free, apparently upon any whim, to later review any number of past bills and

plausibly claim to have been "defrauded" thereby.  In pressing such a standard, GEICO is not only asking the Court to excuse insurers from any reasonable diligence in the conduct of their business, it requires the Court to ignore the very regulatory scheme GEICO relies upon to allege fraud in the first place.

Contrary to the risible premise that fraud that can be obvious to everyone except GEICO, the PIP statute and the regulations relied upon by GEICO clearly contemplate that insurers are actually reviewing all of the documentation submitted in support of bills for services rendered *before* issuing payment.  These statutes and regulations do not exist for insurers to cherry-pick portions of them they wish to exploit for their advantage.  By attempting to do just that, however, GEICO exposes the implausibility of its second legal conclusion.

**C.   GEICO HAS STATED NO BASIS FOR ANY CAUSE OF ACTION AGAINST MARIA RAMOS**

The only specific allegation made against Maria Ramos is that she provided a "limited range of healthcare services" while employed at Tampa Therapy and created *accurate* notes of what she did every time she did it.  There is not a single averment of fact offered, however, to support that Ms. Ramos had any role in, knowledge of, or responsibility for creating and submitting the HCFA forms which constitute the sum total of allegedly false statements made to GEICO.  This failure requires that the causes of action against Ms. Ramos be dismissed in their entirety.

**D.   GEICO'S CLAIMS ARE AMBIGUOUS**

GEICO alleges that 14,844 individual services provided at Tampa Therapy were fraudulently billed but offers a potentially different theory as to each one.  Hundreds of times throughout its Complaint, GEICO applies the caveats "in many cases" and "to the extent the services were provided at all".  These "and/or" type of caveats with respect to so critical an

allegation render the Complaint unfairly ambiguous as it leaves Defendants to guess which theories apply to which claims.  With 14,844 to choose from, this simply does not place Defendants on sufficient notice of the claims against them.  Should the Court determine that GEICO may proceed with some or all of its action, it is respectfully requested that it be required to at least identify each date of service it is alleging was inappropriately billed and which it is alleging were not actually provided.

**MEMORANDUM OF LAW**

To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain sufficient factual matter, which, if accepted as true, would state a claim to relief that is plausible on its face. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.  **The court, however, is not bound to accept as true a legal conclusion stated as a "factual allegation" in the complaint.**  Asbury v. Slider, 2020 WL 871097, at *2 (M.D. Fla. Feb. 21, 2020), *citing* Ashcroft v. Iqbal, 556 U.S. 662, 677-78 (2009) (quoting Fed. R. Civ. P. 8(a)(2))(emphases added).

The "plausibility standard requires that the allegations be more than **merely conceivable**." Pavic v. Laser Spine Inst., LLC, No. 8:13-CV-02578-EAK, 2014 WL 2707953, at *1 (M.D. Fla. June 13, 2014)(emphasis added), *citing* Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  "Application of this standard follows two analytical principles. First, the court will not presume the truth of a complaint's **legal conclusions**. Second, a complaint's well-pleaded factual allegations must allow the court to infer the plausibility, rather than the **mere possibility**, that the plaintiff is entitled to the relief sought." Pavic v. Laser Spine Inst., LLC, No. 8:13-CV-02578-EAK, 2014 WL 2707953, at *1 (M.D. Fla. June 13, 2014)(emphasis added).

As detailed below, even accepting GEICO's bald legal conclusion concerning "direct" supervision as true, GEICO has, at best, alleged the *mere possibility* of fraud, rather than its plausibility.

## I.     <u>GEICO FAILS TO THREAD THE NEEDLE</u>

The outlandish size of GEICO's Complaint is itself a head fake designed to obscure the thin thread from which its fraud claim is woven into whole cloth.

Cutting through its voluminous folds, GEICO's Complaint concedes in paragraphs 303-307 that Florida law itself does not define the level of supervision necessary for a prescribing medical doctor to bill under his name for services provided by nonphysician personnel.  There is certainly no provision within the PIP statute itself which says as much. This is why GEICO must weave its way through state and federal statutes, obscure secondary sources, and the Code of Federal Regulations, to arrive at the patchwork of a legal conclusion only it can see.

### A.     <u>The First Stitch - Florida's Health Care Clinic Act</u>

GEICO starts its construction at Florida's Health Care Clinic Act, Fla. Stat. § 400.9935, the relevant portion of which states:

**(1) Each clinic shall appoint a medical director or clinic director who shall agree in writing to accept legal responsibility for the following activities on behalf of the clinic. The medical director or the clinic director shall:**

**(g) Conduct systematic reviews of clinic billings to ensure that the billings are not fraudulent or unlawful. Upon discovery of an unlawful charge, the medical director or clinic director shall take immediate corrective action. If the clinic performs only the technical component of magnetic resonance imaging, static radiographs, computed tomography, or positron emission tomography, and provides the professional interpretation of such services, in a fixed facility that is accredited by a national accrediting organization that is approved by the Centers for Medicare and Medicaid Services for magnetic resonance imaging and advanced diagnostic imaging services and if, in the preceding quarter, the percentage of scans performed by that clinic which was billed to all personal injury protection insurance carriers was less than 15 percent, the chief financial officer of the clinic may, in a written acknowledgment provided to the agency, assume the**

**responsibility for the conduct of the systematic reviews of clinic billings to ensure that the billings are not fraudulent or unlawful.**

The Health Care Clinic Act states that a Medical Director accepts "legal responsibility" for the activities of the clinic by conducting "systematic reviews" of the clinic's billings. Importantly, however, **"[t]he Clinic Act does not state exactly how thorough a medical director's systematic review must be**…" Allstate Ins. Co. v. Vizcay, 826 F.3d 1326, 1332 (11th Cir. 2016).

Whatever type of systematic review may actually be required, (and not even GEICO pretends to know), the Florida Administrative Code clearly contemplates that Medical Directors are not required to be, nor are they expected to be, physically present within the clinic as the treatment for which they are "accepting legal responsibility" is provided:

**A medical or clinic director may not serve in that capacity for more than a maximum of five health care clinics with a cumulative total of more than 200 employees and persons under contract with the health care clinic at any given time. A medical or clinic director may not supervise a health care clinic more than 200 miles from any other health care clinic supervised by the same medical or clinic director.**

Fla. Admin. Code Ann. r. 59A-33.013.

It is obvious from the above provision that by expressly permitting doctors to serve simultaneously as the Medical Director of up to 5 clinics, which can be as many as 200 miles apart, the legislature did *not* intend to require their physical presence in each office as the treatment for which they are accepting legal responsibility is being provided. GEICO's allegation that a medical director is required to be on the premises for each service supervised therefore finds no support in the Health Care Clinic Act itself.

**B.    Second Stitch – the PIP Statute**

GEICO next turns to the PIP statute, which provides in relevant part:

**An insurer or insured is not required to pay a claim or charges:**

**For medical services or treatment billed by a physician and not provided in a hospital unless such services are rendered by the physician or are <u>incident to</u> his or her professional services and are included on the physician's bill, including documentation verifying that the physician is responsible for the medical services that were rendered and billed.**

Fla. Stat. Ann. § 627.736(5)(a)(5)(b.1)(f)(emphasis added).

The PIP statute does not define what the Florida legislature intended by the phrase "incident to" but does, as GEICO points out, refer generally in various places throughout the statute to Medicare guidelines.  As the Court is no doubt aware, however, the legal paper devoted over the decades to interpreting the seemingly simple phrase of "incident to" in the context of Medicare-related litigation could fill an entire wing of every courthouse in the country.  Consider just the "definition" cited by <u>United States v. Marder</u>, 208 F. Supp. 3d 1296, 1306–07, fn. 11 (S.D. Fla. 2016): "Incident to services" are services that are furnished by other employees of the physician—such as a PA or NP—incident to the professional services personally rendered by the physician."

In other words, "incident to" services are those that are…"incident to."

This lack of clarity within the PIP statute itself necessarily means that GEICO cannot plausibly rely upon it as the basis for alleging that the services provided at Tampa Therapy were fraudulently billed because they were not "incident to" the initial and follow-up examinations and treatment plans GEICO admits Dr. Merced provided.

Having failed to find support in Florida law, GEICO therefore turns next to the morass of federal regulations surrounding the Medicare program.

### C.    The Hem – Medicare Manuals and the CFR

From the PIP statute, GEICO casually turns to a Medicare Claims Processing Manual as if it is Black's Law Dictionary, and from there hems everything up with a one-eyed view of 42 C.F.R. §410.32.  Despite this rather intricate construction effort, however, all that GEICO comes

up with in the end is a naked legal conclusion that has no other authority than GEICO's Complaint.

Far from providing the clarity GEICO claims it does, the Medicare Processing Manual states with respect to properly filling in box 31 of the HCFA-1500 form:[3]

**In the case of a service that is provided <u>incident to</u> the service of a physician or non-physician practitioner, when the ordering physician or non-physician practitioner is directly supervising the service as in 42 CFR 410.32, the signature of the ordering physician or non-physician practitioner shall be entered in item 31. When the ordering physician or non-physician practitioner is not supervising the service, then enter the signature of the physician or non-physician practitioner providing the direct supervision in item 31.**

Here, for the first time in a statute or regulation conceivably applicable to first party medical bills in Florida, we see the word "direct" modifying the word "supervision". However, in the very next sentence, Medicare contradicts itself by eliminating the word "direct" in the first clause. By eliminating the word "direct" in the first clause of the next sentence regarding "incident to" services, Medicare implies that an ordering physician may be able to properly supervise an "incident to" service without necessarily doing so "directly."

This is a reasonable inference because 42 CFR §410.32 outlines *3 different types of supervision*: General, Direct, and Personal:

**(i) *General supervision* means the procedure is furnished under the physician's overall direction and control, <u>but the physician's presence is not required during the performance of the procedure</u>. Under general supervision, the training of the nonphysician personnel who actually perform the diagnostic procedure and the maintenance of the necessary equipment and supplies are the continuing responsibility of the physician.**

**(ii) *Direct supervision* in the office setting means the physician must be present in the office suite and immediately available to furnish assistance and direction throughout the performance of the procedure. It does not mean that the physician must be present in the room when the procedure is performed.**

**(iii) *Personal supervision* means a physician must be in attendance in the room during the performance of the procedure.**

---

[3] It is critical to note again that the "misrepresentation" alleged by GEICO in every claim at issue is that Dr. Gomez-Cortes's name appeared in box 31 of this form.

The CFR thus actually provides that in order to be compensable, "incident to" services "must be furnished under *at least* a general level of physician supervision as defined" in the statute.  By eliminating the word "directly" in the first clause of the second sentence regarding box 31 of the HCFA, the Medicare Manual appears to be stating that a physician providing *at least* a general level of supervision may still appropriately bill for services provided by "nonphysician personnel" so long as he accepts legal responsibility for their training and equipment.  GEICO admits that Dr. Merced did this much by agreeing to act as the Medical Director at Tampa Therapy.

GEICO's accusation of fraud with respect to the use of Dr. Merced's name in box 31 of the HCFA forms is thus an incredibly narrow legal conclusion.  It posits that the *only* circumstance under which a doctor's name may be truthfully inserted in box 31 for "incident to" services rendered by nonphysician personnel is if the doctor was physically in the office suite when the services were provided.  According to this narrow theory, if Dr. Merced was down the block at, say, Caribe Health Center,[4] but always immediately available to be in Tampa Therapy's office within a few minutes of being called, Tampa Therapy committed *fraud* by putting Dr. Merced's name in box 31 of HCFA bills for services rendered while he was at Caribe.

This bald legal conclusion is presented as if it is hornbook law without citation to caselaw or any statute that specifically stands for it.  The obscure and inconsistent mention in a two sentence blurb from a Medicare Processing Manual, which actually refers to *3 different kinds of supervision,* is not reliable authority for the proposition that "direct" (meaning contemporaneous, in-office) supervision of "incident to services" is the *only* basis upon which a supervising

---

[4] Tampa Therapy is located at 4148 N. Armenia Avenue in Tampa.  Caribe Health is located at 5101 N. Armenia Avenue.  Park Place Therapy is located at 6802 N. Armenia Avenue.  The Right Spinal Clinic is located at 4019 W. Waters Ave.  Bay Area Health is located at 1419 W. Waters Ave.

physician's name may be inserted into box 31 of a HCFA form billing for services provided by nonphysician personnel.

The plausibility of GEICO's fraud accusation is tethered completely to this very narrow and unsupported legal conclusion. Every single "fact" GEICO offers to argue fraud is designed solely to show that Dr. Merced did not provide contemporaneous, in-office supervision of every individual service allegedly at issue.

While these "facts" may support a plausible inference that Dr. Merced was not standing in Tampa Therapy's office when every service billed was performed, GEICO offers no facts which plausibly demonstrate the level of supervision *Dr. Merced actually provided* over these services.

The absence of any allegation as to the level of supervision Dr. Merced actually provided is fatal to GEICO's claim. This is because all of its facts are offered to support the plausibility of just its narrow legal conclusion. In other words, by alleging facts which only support its own narrow legal conclusion, GEICO has, at best, alleged "the **mere possibility"** that it is entitled to the relief it seeks. Pavic v. Laser Spine Inst., LLC, *infra*. at *1.

It is critical to note that GEICO's failure to allege facts concerning the level of supervision Dr. Merced actually provided cannot be the result of not knowing them, given GEICO's averments in paragraph 1,027 that **"The Defendants have hired law firms to pursue collection of the fraudulent charges for the Fraudulent Services from GEICO and other insurers. These law firms routinely file expensive and time-consuming litigation against GEICO and other insurers if the charges are not promptly paid in full."**

Given all of this allegedly routine "expensive and time-consuming litigation" seeking "collection of the fraudulent charges" by the Defendants, there <u>must</u> be a plethora of pleadings, deposition testimony, and discovery documents (not to mention summary judgment

motions/orders) which directly reveal the *actual level of supervision* that Dr. Merced provided over the services which are the subject of the allegedly fraudulent charges. GEICO must have reams of information at this point about where Dr. Merced *actually was* and what he was *actually doing* on any given day over the course of the last several years when these services were rendered. Yet GEICO offers the Court nothing in this regard and limits its factual allegations to circumstantially suggesting only that he was not physically in every office as every service billed was rendered.

In short, GEICO has offered a naked legal opinion that the *only* way a licensed physician may properly bill under his name for "incident to" services provided by nonphysician personnel, regardless of what those services may be, is if he was in the room/office when the service was performed. If this legal conclusion is wrong, however, then GEICO has not even alleged a single false representation, much less fraud.

Moreover, if it is a reasonable interpretation of the byzantine layers of statutes and regulations which apply here that a *general* level of supervision permits a licensed medical doctor to bill for "incident to" services performed by nonphysician personnel, then GEICO has clearly failed to state a plausible claim that Defendants *knowingly* submitted any false bills.

The scienter component of GEICO's fraud claim, consisting as it does of interpreting Medicare guidelines for the proper submission of bills, is most analogous to those most often made in the context of the False Claims Act. The universal holding in evaluating the viability of such claims is that "if the defendant's interpretation of a statute or regulation was reasonable, and "*if there is no authoritative contrary interpretation*" of the rule, the relator cannot satisfy the knowledge requirement under the False Claims Act. United States v. Space Coast Med. Assocs., L.L.P., 94 F. Supp. 3d 1250, 1262–63 (M.D. Fla. 2015)(emphasis added), *citing* United States ex

rel. Hixson v. Health Mgmt. Sys., Inc., 613 F.3d 1186, 1190 (8th Cir.2010); *and* United States ex rel. Streck v. Allergan, Inc., 894 F.Supp.2d 584, 595–96 (E.D.Pa.2012) (holding that when there was no regulatory guidance on a particular issue, the relators did not adequately plead that the defendants had knowledge of false claims); *and* United States v. Prabhu, 442 F.Supp.2d 1008, 1029 (D.Nev.2006) ("[A] Defendant does not 'knowingly' submit a 'false' claim when his conduct is consistent with a reasonable interpretation of ambiguous regulatory guidance.").

GEICO cannot and does not cite to any authoritative interpretation of the PIP statute which defines the specific level of supervision a licensed *physician* must provide over nonphysician personnel in order to bill for their services under the physician's name.

Therefore, even if the Court were to credit GEICO with having plausibly alleged that Dr. Merced's name appearing in box 31 of the HCFA forms was actually a false statement, it has still failed to plausibly allege that any such submission was "knowingly" false.  Under the facts plead by GEICO, it is just as likely that Dr. Merced provided a *general* level of supervision over the services provided at Tampa Therapy as that he provided none.

Having failed to plead any facts to show that Dr. Merced did not provide a *general* level of supervision over the services provided at Tampa Therapy, or that he provided none, GEICO has failed to adequately plead that Tampa Therapy and/or Dr. Merced "knowingly" submitted false claims.

**D.       GEICO'S FDUTPA and Unjust Enrichment Claims Cannot Survive The Complaint's Absence of Plausibility**

GEICO will likely argue that its claims under the FDUTPA statute (§501.201 et. seq.) and Unjust Enrichment can ultimately succeed even in the absence of intentional fraud.  This does not, however, save the claims from the heightened pleading requirements for a fraud claim.

On June 3, 2019, Chief Judge Moore of the Southern District of Florida dismissed a claim by State Farm alleging FDUTPA violations as the result of a physician's submissions of allegedly false bills, and did so pursuant to the heightened pleading requirements for fraud. State Farm argued against such dismissal on the basis that it need not prove fraud to prevail at trial on its FDUTPA claim. Judge Moore rejected this argument, stating:

**[A]ny claim sounding in fraud must be pled with particularity regardless of whether fraud is explicitly pled or ultimately proven. Although State Farm correctly argues that it need not prove any "specific intent to defraud" under FDUTPA, the principal inquiry at issue is whether the allegations in State Farm's Complaint are based upon a unified course of fraudulent conduct or contains averments of fraud that must be pled with particularity.**

(See Judge Moore's Memorandum in State Farm v. Feijoo, et. al., 18-cv-23329, ECF Doc. #56, a copy of which is attached hereto as Exhibit "B" for the Court's convenience). This same reasoning obviously applies equally to GEICO's unjust enrichment claim, as it, too, is based upon an alleged unified course of fraudulent conduct.[5]

Also militating against the plausibility of GEICO's FDUTPA claim in this case is its *admitted* failure to conduct itself as a reasonable consumer would have under the same circumstances. FDUTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204(1). The elements comprising a consumer claim for damages under FDUTPA are: (1) a deceptive act or unfair practice; (2) causation; and (3) actual damages. City First Mortg. Corp. v. Barton, 988 So.2d 82, 86 (Fla.Dist.Ct.App.2008).

---

[5] *See* also Space Coast Credit Union v. Merrill Lynch, Pierce, Fenner & Smith Inc., 295 F.R.D. 540, 545 (S.D. Fla. 2013), *citing* United States ex rel. Citizens United to Reduce & Block Fed. Fraud, Inc. v. Metro. Med. Ctr., No. 89–0592–CIV, 1990 WL 10519617, at *3 (S.D.Fla. Jan. 11, 1990) (holding that unjust-enrichment claim based on "fraudulent taking of money ... must satisfy Rule 9(b)").

In order to prevail on its FDUTPA claim in this case, GEICO must ultimately prove that a consumer in the same circumstances would likely have been deceived by Dr. Merced's name appearing in box 31 of the HCFA forms submitted by Tampa Therapy.  "In the Eleventh Circuit, a party "must [also] prove that the alleged [deceptive or unfair] practice was likely to deceive a consumer acting reasonably in the same circumstances."  Cluck-U Chicken, Inc. v. Cluck-U Corp., , 2017 WL 10275957, at *9 (M.D. Fla. June 6, 2017), *citing* Cold Stone Creamery, Inc. v. Lenora Foods I, LLC, 332 F. App'x 565, 567 (11th Cir. 2009).  This "element of a FDUTPA claim is only satisfied by evaluating a reasonable consumer in the same circumstances as the plaintiff."  Deere Constr., LLC v. CEMEX Constr. Materials Fla., LLC, 2016 WL 8542540, at *3 (S.D. Fla. Dec. 1, 2016).

By GEICO's own pleading, the only way it could possibly have been "deceived" by Dr. Merced's name appearing in box 31 of the HCFA forms submitted by Tampa Therapy is if it blindly paid the bills without ever reviewing the documents which came with them.  After all, GEICO freely admits that every HCFA form was accompanied by a therapy note signed by Maria Ramos and clearly indicating that Ms. Ramos had provided the services being billed under Dr. Merced's name.

Just so the Court can appreciate just how prominently Ms. Ramos' name, licensure, and activities were made clear to GEICO, attached as Exhibit "C" is just one submission referenced in Exhibit 4 by which GEICO claims to have been "deceived".  As the Court can easily appreciate with a quick glance at this note, the only way anyone could have missed the fact that Ms. Ramos performed the therapy services being billed was *simply not to look at the records* before issuing payment.

As detailed further below, not only was this *not* the conduct of a reasonable "consumer," such deliberate myopia directly violates the very statutory scheme with which GEICO seeks to blanket itself.

### E. GEICO Cannot Cherry-pick Only the Portions of Statutes it Likes

As detailed above, GEICO weaves together portions of various state and federal statutes and secondary sources to present a legal conclusion on which it bases its allegation of fraud. Yet, tellingly, GEICO leaves on the cutting room floor large swaths of the statutes which directly clash with the strait jacket GEICO is determined to force upon every medical clinic in Florida.

For example, the CFR contains "Documentation and Recordkeeping Requirements" which clearly contemplate that the payor (be it the federal government or an insurer) will require and scrutinize documentation submitted alongside a HCFA form and individually determine whether the treatment being billed was reasonable, necessary, and otherwise compliant with the requirements of the statute, before issuing payment. See 42 C.F.R. § 410.32(d)(2).

This portion of the CFR tracks provisions of Florida's PIP statute which also clearly contemplate that insurers will actually review documentation of services provided before issuing payment. Consider § 627.736(6)(b):

**(b) Every physician, hospital, clinic, or other medical institution providing, before or after bodily injury upon which a claim for personal injury protection insurance benefits is based, any products, services, or accommodations in relation to that or any other injury, or in relation to a condition claimed to be connected with that or any other injury, shall, if requested by the insurer against whom the claim has been made, furnish a written report of the history, condition, treatment, dates, and costs of such treatment of the injured person and why the items identified by the insurer were reasonable in amount and medically necessary, together with a sworn statement that the treatment or services rendered were reasonable and necessary with respect to the bodily injury sustained and identifying which portion of the expenses for such treatment or services was incurred as a result of such bodily injury, and produce, and allow the inspection and copying of, his or her or its records regarding such history, condition, treatment, dates, and costs of treatment if this does not limit the introduction of evidence at trial.**

And § 627.736(4)(i):

**"If an insurer has a reasonable belief that a fraudulent insurance act, for the purposes of s. 626.989 or s. 817.234, has been committed, the insurer shall notify the claimant, in writing, within 30 days after submission of the claim that the claim is being investigated for suspected fraud. Beginning at the end of the initial 30-day period, the insurer has an additional 60 days to conduct its fraud investigation. Notwithstanding subsection (10), no later than 90 days after the submission of the claim, the insurer must deny the claim or pay the claim with simple interest as provided in paragraph (d). Interest shall be assessed from the day the claim was submitted until the day the claim is paid. All claims denied for suspected fraudulent insurance acts shall be reported to the Division of Investigative and Forensic Services.**

Despite the clear expectation that payors will actually review supporting documentation of services before issuing payment, the plausibility of GEICO's claim is dependent upon its having done no such thing. GEICO claims instead to have been "defrauded" by documentation its own Complaint describes as so facially and obviously deficient that Dr. Merced cannot possibly have reviewed them sufficiently. See ECF 1, ¶315-318. Yet GEICO points merely to the information contained in the records which were originally submitted to it as the sole basis for this accusation.

By offering up just the information contained in Tampa Therapy's records as evidence of the fraud it alleges, GEICO admits it chose not to utilize the statutory tools provided by the legislature to address suspected fraud. Given the breathlessness with which GEICO excoriates every aspect of the information in Tampa Therapy's records, GEICO's choice not to use the procedures available under these provisions operates as a waiver of its right to shop for a second bite of the apple in the forum of federal court.

But even if GEICO has not explicitly waived its right to accuse Tampa Therapy of fraud entirely, its circular "facts" unwittingly lock its entire Complaint in an implausible box. The only way GEICO could have been "defrauded" by Tampa Therapy's bills is if it never looked at them in the first place. This of course destroys any pretense to "justifiable reliance," but more importantly, fails to meet the particularity requirements of Rule 9(b). In order to pass muster

thereunder, a Plaintiff must not only describe the author, date, and content of alleged misrepresentations, it must specifically allege **the manner in which they misled the plaintiff**. Johnson Controls, Inc. v. Uribazo, 2012 WL 6652934, at *2 (S.D. Fla. Dec. 21, 2012)(internal citations omitted). According to GEICO's own Complaint, however, the only manner in which it could possibly have been misled by Defendants' bills is if it never reviewed the documents in the first place.

By its own pleading, GEICO alleges that Tampa Therapy's records were so devoid of reasonableness and/or necessity that Dr. Merced must have committed *fraud* by not identifying them as such. It is simply implausible for this to be true *and* for GEICO to have missed the alleged fraud before paying the bills by which it now claims to have been defrauded.

The Court is simply not required to accept GEICO's naked legal conclusion that only "direct" supervision by a licensed physician over nonphysician personnel permits the physician's name to be placed in box 31 of HCFA forms. Even if it were though, given the patchwork manner in which GEICO obviously conjured the conclusion, it cannot serve as the plausible basis for an allegation of intentional fraud.

Equally implausible, of course, is GEICO's logically impossible suggestion that the bills of Tampa Therapy were so obviously fraudulent that anyone who looked at the records would have seen it…except GEICO.

Because GEICO has failed to set forth a plausible accusation of fraud, its Complaint should be dismissed in its entirety.

## II.     GEICO IMPERMISSIBLY LUMPS DEFENDANTS TOGETHER

Should the Court not dismiss the Complaint in its entirety, it is respectfully submitted that GEICO's claims against Maria Ramos should be dismissed for lack of particularity.

"Civil RICO claims, which are essentially a certain breed of fraud claims, must be pled with an increased level of specificity." Ambrosia Coal & Const. Co. v. Pages Morales, 482 F.3d 1309, 1316 (11th Cir. 2007), *citing* Fed.R.Civ.P. 9(b) and Brooks v. Blue Cross and Blue Shield of Florida, Inc*.,* 116 F.3d 1364, 1380–81 (11th Cir.1997).

In Brooks*,* the 11th Circuit concluded that the complaint alleging a RICO claim did not meet the Rule 9(b) particularity standard because it was devoid of specific allegations with respect to each defendant; the plaintiffs lumped together all of the defendants in their allegations of fraud. "[I]n a case involving multiple defendants ... the complaint should inform each defendant of the nature of his alleged participation in the fraud." Id. at 1381.

GEICO's RICO and fraud allegations repeatedly lump all of the Tampa Therapy Defendants together without offering specific allegations as to each. As an example, paragraph 1,188 of the Complaint offers the conclusion that "Ulloa, Rodriguez, Merced, Mathieson, *and Ramos* knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other automobile insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO."

The only specific factual allegation made against Maria Ramos in "support" of this conclusion, however, is that she provided a "limited range of healthcare services" and created *accurate* notes thereof. There is not a single averment of fact offered to support GEICO's allegation that Ms. Ramos ever made a single false representation of any kind, or had any role in or responsibility for creating and submitting the HCFA forms which constitute the sum total of allegedly false statements made to GEICO.

Having failed to allege any facts supporting its allegation that Ms. Ramos made any false statements or knowingly participated in any aspect of billing, none of GEICO's causes of action against Ms. Ramos are stated with the required particularity and must be dismissed as to her.

## II. IF ALLOWED TO PROCEED, GEICO MUST PROVIDE A MORE DEFINITE STATEMENT

Exhibit 4 to GEICO's Complaint purports to identify 14,844 individual services provided at Tampa Therapy, each one of which it alleges to have been fraudulently billed. However, in characterizing the fraud alleged to have been committed with respect to each of these services, GEICO repeatedly adds the caveats "in many cases" and "to the extent they were provided at all." (See Complaint generally). These caveats are the equivalent of adding an "and/or" qualifier to *every date of service at issue* and renders the allegations unfairly ambiguous.

If required to answer GEICO's Complaint in its current form, Tampa Therapy would be left to guess which theory of fraud is alleged as to which of 14,844 separate dates of service.

"The Complaint's usage of several "and/or" conjunctions among other ambiguities, make the allegations against Defendants vague and ambiguous. Joe Hand Promotions, Inc. v. Creative Entm't, LLC, 978 F. Supp. 2d 1236, 1240 (M.D. Fla. 2013), *citing* J & J Sports Prods., Inc. v. Torres, 2009 WL 1774268 (M.D.Fla. June 22, 2009); and United States v. Bush, 70 F.3d 557, 562 (10th Cir.1995) (explaining that the use of "and/or" is strongly disfavored because it creates unnecessary ambiguity)).

GEICO's accusation of fraud is vague and ambiguous in that it allows the pursuit of multiple and wildly different theories as to each one of 14,844 individual dates of service. "Plaintiffs in federal court are permitted to plead in the alternative, but they are not permitted to plead "in the ambiguous". Id., citing Fed.R.Civ.Pro. 8(d)(2).

Accordingly, should the Court find that GEICO's claim may proceed, it is respectfully requested that GEICO be ordered to provide a more definite statement as to which specific treatments listed on Exhibit 4 it is alleging were simply billed inappropriately and which it is alleging were not actually provided.

## III.   CONCLUSION

Despite GEICO's loud and boisterous parade of paper, and for all of its creative legal weaving (and at the risk of torturing the analogy), it is apparent upon scrutiny that the emperor really has no clothes.  GEICO is simply attempting to invent a new legal framework which satisfies its agenda to impose upon all medical clinics in Florida more restrictions than it has been able to convince the legislature to add to the PIP statute.

GEICO candidly reveals its belief that the PIP statute procedurally disadvantages its ability to deny or limit PIP payments.  Recall its plaint in paragraph 1,027: **"The Defendants have hired law firms to pursue collection of the fraudulent charges for the Fraudulent Services from GEICO and other insurers. These law firms routinely file expensive and time-consuming litigation against GEICO and other insurers if the charges are not promptly paid in full."**

If GEICO's torturously plead allegations in this Court truly had *any* plausibility, there is simply no way GEICO could ever lose any litigation over its denial of payment or that GEICO would feel compelled to pay bills for fear of it.  But GEICO obviously loses in state court so often that it is going shopping for relief in its preferred forum of federal court.[6]  GEICO transparently wishes to use this Court to establish limitations on PIP billing which it has not been

---

[6] Almost simultaneously with its filing in this Court, GEICO filed a virtually identical Complaint against 32 clinics, doctors and other individuals in the Southern District.  See GEICO v. Gomez-Cortez, et. al., 20-cv-21558-KMW (S.D. Fla., filed 4/13/2020).

able to achieve through the "legal struggle" it acknowledges to have been ongoing between insurers and medical providers for years in Florida as to the permissible scope of their services.

For all of the foregoing reasons, it is respectfully submitted that GEICO has failed to plausibly state a claim for fraud and its Complaint should therefore be dismissed in its entirety.

Respectfully Submitted,

/s/ Michael Hrdlicka                                        /s/ Andrew P. Baratta
_____                    _____
MICHAEL HRDLICKA, ESQUIRE                    ANDREW P. BARATTA, ESQUIRE

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 19th day of May, 2020, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following:

- **Yonatan M. Bernstein** at yonatan.bernstein@rivkin.com
- **Christian Carrazana** at PO Box 900520, Homestead, Florida 33030
- **John Patrick Marino** at jmarino@sgrlaw.com
- **Mark P. Rankin** at mark@rankinlawoffice.com
- **Lindsey R. Trowell** at ltrowell@sgrlaw.com
- **Robert R. Warchola, Jr.** at rwarchola@shumaker.com
- **Kristen Lindsay Wenger** at kwenger@sgrlaw.com

/s/ Michael Hrdlicka                                        /s/ Andrew P. Baratta
_____                    _____
MICHAEL HRDLICKA, ESQUIRE                    ANDREW P. BARATTA, ESQUIRE
Gomez & Touger, P.A.                                      Baratta, Russell, & Baratta
5705 US Highway 98 South                            3500 Reading Way
Lakeland, Florida 33812                                 Huntingdon Valley, Pennsylvania 19006
Telephone:  863-533-9559                             Telephone: 215-914-2222
Facsimile: 863-337-5670                                Facsimile: 215-914-2118
Email: mhrdlicka@gotofloridalaw.com         Email: andrew@barattarussell.com
Florida Bar No.: 0102669                              Pennsylvania Bar No.: 82250
Attorney for Defendant                                 Attorney for Defendant