**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

GOVERNMENT EMPLOYEES INSURANCE
CO., GEICO INDEMNITY CO., GEICO
GENERAL INSURANCE COMPANY and
GEICO CASUALTY CO.,

     Plaintiffs,

vs.

LUIS MERCED, M.D., THE RIGHT SPINAL
CLINIC, INC., YUNIED MORA-JIMENEZ,
KENDRICK EUGENE DULDULAO, M.D.,
VICTOR SILVA, M.D., STEPHEN
DIAMANTIDES, D.C., YULIETA PEREZ
RODRIGUEZ, L.M.T., ALEXIS GARCIA-
GAMEZ, L.M.T., MIGNELIS VELIZ SOSA,
L.M.T., CARIBE HEALTH CENTER, INC.,
ANA DOMINGUEZ, AISHA CHIRINO,
L.P.T.A, PARK PLACE THERAPY, L.L.C.,
JOSE LOPEZ, L.M.T., TATIANA GONZALEZ
FERNANDEZ, L.M.T., THERAPY CENTER
OF TAMPA, L.L.C., LUIS RODRIGUEZ,
IVETTE ULLOA, MARIA RAMOS, L.M.T.,
BAY AREA HEALTH & REHABILITATION,
INC., ANA REYES, WALTER DIAZ, L.M.T.,
AND CARLOS BARRETO FIGUEROA,
L.M.T.,

     Defendants.

_____/

**Case No.: 8:20-cv-00802-CEH-AAS**

**Jury Trial Demand**

**<u>AMENDED COMPLAINT</u>**

Plaintiffs, Government Employees Insurance Co., GEICO Indemnity Co., GEICO General

Insurance Company and GEICO Casualty Co. (collectively "GEICO" or "Plaintiffs"), sue

Defendants and allege as follows:

1.    This action seeks to recover more than $3,100,000.00 that Defendants wrongfully

obtained from GEICO by submitting, and causing to be submitted, thousands of fraudulent no-fault

("no-fault", "personal injury protection", or "PIP") insurance charges through Defendants The Right Spinal Clinic, Inc. ("Right Spinal"), Caribe Health Center, Inc. ("Caribe Health"), Park Place Therapy, L.L.C. ("Park Place Therapy"), Therapy Center of Tampa, L.L.C ("Therapy Tampa"), and Bay Area Health & Rehabilitation, Inc. ("Bay Area Health")(collectively the "Clinic Defendants"), relating to medically unnecessary, illusory, unlawful, and otherwise non-reimbursable health care services, including putative initial examinations, follow up examinations, and physical therapy services (collectively the "Fraudulent Services"), that purportedly were provided to Florida automobile accident victims ("Insureds") who were eligible for coverage under GEICO no-fault insurance policies. In addition, GEICO seeks a declaration that it is not legally obligated to pay reimbursement of pending no-fault insurance claims that Defendants have submitted or caused to be submitted through the Clinic Defendants, because of the fraudulent and unlawful activity set forth herein.

2.      Each and every charge submitted through the Clinic Defendants since at least 2015 has been fraudulent and unlawful for the reasons set forth herein. The charts annexed hereto as Exhibits "1" – "5" set forth a large and representative sample of the fraudulent and unlawful claims that have been identified to date that have been submitted to GEICO by mail through the respective Clinic Defendants. Defendants' interrelated fraudulent schemes began no later than 2015, and have continued uninterrupted since that time.

## THE PARTIES

3.      Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co. (collectively, "GEICO") are Maryland corporations with their principal places of business in Chevy Chase, Maryland.  GEICO is authorized to conduct business and to issue automobile insurance policies in Florida.

4.      The Defendants are as follows:

(i)     Defendant Luis Merced, M.D. ("Merced") was licensed to practice medicine in Florida on August 23, 1989, falsely purported to serve as medical director at each of the Clinic Defendants, and falsely purported to perform or directly supervise a massive amount of the Fraudulent Services on behalf of each of the Clinic Defendants.

(ii)    Defendant Right Spinal is a Florida corporation with its principal place of business in Florida. At all relevant times, Right Spinal falsely purported to be a properly-licensed health care clinic that operated in compliance with the licensing and operating requirements set forth in the Florida Health Care Clinic Act (the "Clinic Act", Fla. Stat. § 400.990 et seq.). Right Spinal was incorporated in Florida on or about July 27, 2017, purported to be owned and controlled by Defendant Yunied Mora-Jimenez ("Mora-Jimenez"), falsely purported to have Defendant Merced as its legitimate medical director, and was used as a vehicle to submit fraudulent no-fault insurance billing to GEICO and other insurers, including billing for Fraudulent Services that purportedly were performed by Defendants Merced, Kendrick Eugene Duldulao, M.D. ("Duldulao"), Victor Silva, M.D. ("Silva"), Stephen Diamantides, D.C. ("Diamantides"), Yulieta Perez Rodriguez, L.M.T. ("Perez"), Alexis Garcia-Gamez, L.M.T. ("Garcia"), and Mignelis Veliz Sosa, L.M.T. ("Veliz")(Defendants Right Spinal, Mora-Jimenez, Merced, Duldulao, Silva, Diamantides, Perez, Garcia, and Veliz collectively are referred to as the "Right Spinal Defendants").

(iii)   Defendant Caribe Health is a Florida corporation with its principal place of business in Florida. At all relevant times, Caribe Health falsely purported to be a properly-licensed health care clinic that operated in compliance with the licensing and operating requirements set forth in the Clinic Act. Caribe Health was incorporated in Florida on or about June 23, 2009, purported to be owned and controlled by Defendant Ana Dominguez ("Dominguez"), falsely purported to have Defendant Merced as its legitimate medical director, and was used as a vehicle to submit fraudulent no-fault insurance billing to GEICO and other insurers, including billing for Fraudulent Services that purportedly were performed by Defendants Merced and Aisha Chirino, L.M.T., L.P.T.A. ("Chirino")(Defendants Caribe Health, Dominguez, Merced, and Chirino collectively are referred to as the "Caribe Health Defendants").

(iv)    Defendant Park Place Therapy is a Florida limited liability company with its principal place of business in Florida. At all relevant times, Park Place Therapy falsely purported to be a properly-licensed health care clinic that operated in compliance with the licensing and operating requirements set forth in the Clinic Act. Park Place Therapy was organized in Florida on or about July 30, 2009, purported to have Defendant Jose Lopez, L.M.T. ("Lopez") as its owner and member, falsely purported to have Defendant Merced as its legitimate medical director, and was used as a vehicle to submit fraudulent no-fault insurance billing to GEICO and other insurers, including billing for Fraudulent Services that purportedly were performed by Defendants Merced, Lopez, Silva, and Tatiana Gonzalez Fernandez, L.M.T.

3

("Gonzalez")(Defendants Park Place Therapy, Lopez, Merced, Silva, and Gonzalez collectively are referred to as the "Park Place Therapy Defendants").

(v)     Defendant Therapy Tampa is a Florida limited liability company with its principal place of business in Florida. At all relevant times, Therapy Tampa falsely purported to be a properly-licensed health care clinic that operated in compliance with the licensing and operating requirements set forth in the Clinic Act. Therapy Tampa was organized in Florida on or about March 8, 2016, purported to have Defendant Ivette Ulloa ("Ulloa") as its owner and member from about February 2017 until March 2018, purported to have Defendant Luis Rodriguez ("Rodriguez") as its owner and member from about March 2018 to the present, falsely purported to have Defendant Merced as its legitimate medical director, and was used as a vehicle to submit fraudulent no-fault insurance billing to GEICO and other insurers, including billing for Fraudulent Services that purportedly were performed by Defendants Merced and Maria Ramos, L.M.T. ("Ramos")(Defendants Therapy Tampa, Ulloa, Rodriguez, Merced, and Ramos collectively are referred to as the "Therapy Tampa Defendants").

(vi)    Defendant Bay Area Health is a Florida corporation with its principal place of business in Florida. At all relevant times, Bay Area Health falsely purported to be a properly-licensed health care clinic that operated in compliance with the licensing and operating requirements set forth in the Clinic Act. Bay Area Health was incorporated in Florida on or about January 6, 2005, purported to be owned and controlled by Defendant Ana Reyes ("Reyes"), falsely purported to have Defendant Merced as its legitimate medical director, and was used as a vehicle to submit fraudulent no-fault insurance billing to GEICO and other insurers, including billing for Fraudulent Services that purportedly were performed by Defendants Merced, Walter Diaz, L.M.T. ("Diaz") and Carlos Barreto Figueroa, L.M.T. ("Figueroa")(Defendants Bay Area Health, Reyes, Merced, Diaz, and Figueroa collectively are referred to as the "Bay Area Health Defendants").

(vii)   All of the natural person Defendants reside in and are citizens of Florida.

5.      Although they are not named as a Defendants in this Amended Complaint, Ronald Robiner, D.C. ("Robiner") and Brock Mathieson, D.C. ("Mathieson") are relevant to this action. Robiner is a chiropractor licensed to practice chiropractic in Florida, and purportedly performed health care services on behalf of Caribe Health. Mathieson was a chiropractor licensed to practice chiropractic in Florida, and purportedly performed health care services on behalf of Therapy Tampa and Caribe Health.

## JURISDICTION AND VENUE

6.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the total matter in controversy, exclusive of interest and costs, exceeds the jurisdictional threshold of $75,000.00, and is between citizens of different states.  This Court also has original jurisdiction pursuant to 28 U.S.C. § 1331 over claims brought under 18 U.S.C. §§ 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ("RICO") Act).  In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

7.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Middle District of Florida is the District where one or more of Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS

### I.     Brief Overview of Pertinent Law Governing No-Fault Insurance Reimbursement

8.     Florida requires automobile insurers to PIP insurance benefits ("PIP Benefits") to Insureds when they are injured in a motor vehicle accident. See Florida Motor Vehicle No-Fault Law, Fla. Stat. §§ 627.730-627.7405 (the "No-Fault Law").

9.     Under the No-Fault Law, a health care services provider who possesses an assignment of PIP Benefits from an Insured and who provides medically necessary health care services to an Insured may submit claims directly to an insurance company in order to receive payment for medically necessary services, using the required claim forms, including the Health Care Financing Administration insurance claim form (known as the "HCFA-1500 form" or "CMS-1500" form).

10.     In order for a health care service to be eligible for PIP reimbursement, it must be "lawfully" provided, medically necessary, and the bill for the service cannot misrepresent the nature or extent of the service that was provided. Insurers such as GEICO are not required to pay anyone who knowingly submits a false or misleading statement relating to a PIP claim or charges.  See Fla. Stat. § 627.736.

11.     In addition, the No-Fault Law prohibits PIP reimbursement for massage or for services provided by unsupervised massage therapists. See Fla. Stat. § 627.736.

12.     Moreover, Florida law requires physical therapist assistants to work under the supervision of a licensed physical therapist. See Fla. Stat. § 486.021. Accordingly, insurers such as GEICO are not required to pay PIP reimbursement for services that are unlawfully performed by unsupervised physical therapist assistants.

13.     Pursuant to the Clinic Act, clinics operating in Florida must – among other things – appoint a medical director who must "[c]onduct systematic reviews of clinic billings to ensure that the billings are not fraudulent or unlawful", and take immediate corrective action upon discovery of a fraudulent or unlawful charge. See Fla. Stat. § 400.9935(1).  In addition, a clinic medical director must "[e]nsure that all health care practitioners at the clinic have active appropriate certification or licensure for the level of care being provided." See Fla. Stat. § 400.9935(1).

14.     Pursuant to the Clinic Act, "[a] charge or reimbursement claim made by or on behalf of a clinic that is required to be licensed . . . but that is not so licensed, or that is otherwise operating in violation of this part . . . is an unlawful charge." See Fla. Stat. § 400.9935(3).

II.     **The Defendants' Interrelated Fraudulent and Unlawful Schemes**

A.     **The Unlawful Operation of the Clinic Defendants Without Legitimate Medical Directors**

15.     Because the Clinic Defendants were subject to the Clinic Act, Mora-Jimenez, Dominguez, Lopez, Rodriguez, Ulloa, and Reyes (collectively the "Clinic Owner Defendants") could not operate the respective Clinic Defendants unless licensed physicians were employed as the Clinic Defendants' medical directors. However, if the Clinic Owner Defendants retained legitimate physicians to serve as the Clinic Defendants' medical directors, any such legitimate physicians actually would be obligated to fulfill the statutory requirements applicable to a clinic medical director, which would impede the Defendants' interrelated schemes, as described herein.

16.     Accordingly, each of the Clinic Owner Defendants retained Merced, a licensed physician who was willing to falsely pose as the legitimate medical director of each of the Clinic Defendants.

17.     Upon information and belief, Merced was receptive to the Clinic Owner Defendants' respective offers because his relatively advanced age, delayed Florida licensure, and limited credentials made it difficult for him to obtain legitimate, sufficiently-remunerative employment as a physician.

18.     For instance, Merced was between his late 70s and mid 80s during the period between 2015 and the present when he falsely purported to serve as the "medical director" at the respective Clinic Defendants

19.     Though Merced received his medical degree in Puerto Rico in January 1977, Merced did not become licensed to practice medicine in Florida until 1989, by which time he was already approximately 53 years old.

20.     In addition, Merced's only board certification was in family medicine, which – together with his relatively advanced age and delayed Florida licensure – limited his prospects for highly-remunerative employment as a physician.

21.     Upon information and belief, Merced was also receptive to the Clinic Owner Defendants' respective offers because of financial distress.

22.     For instance, Merced and his wife were subject to a $77,117.00 federal tax lien in early 2014, which was not released until early 2019. This 2014 -2019 period roughly coincided with the period between 2015 and the present when Merced purported to serve as "medical director" at the respective Clinic Defendants.

23.     In order to circumvent Florida law and induce the Florida Agency for Health Care Administration to maintain the Clinic Defendants' licensure and to permit the Clinic Defendants to operate as health care clinics, each of the Clinic Defendants and their respective Clinic Owner Defendants entered into a secret scheme with Merced. In exchange for compensation from the respectibe Clinic Defendants and Clinic Owner Defendants, Merced agreed to falsely represent, to the Florida Agency for Health Care Administration, to the Insureds who sought treatment at the Clinic Defendants, and to the insurers including GEICO that received PIP claims from the Clinic Defendants, that he was the true medical director at the respective Clinic Defendants, and that he truly fulfilled the statutory requirements applicable to clinic medical directors at the Clinic Defendants

24.     However, Merced never genuinely served as medical director at any of the Clinic Defendants.  Instead, from the beginning of his association with each of the Clinic Defendants as its phony "medical director", Merced ceded all day-to-day decision-making and oversight

regarding health care services at the Clinic Defendants, and the resulting billing, to the respective Clinic Owner Defendants.

25.     As set forth herein, Merced never ensured that all health care practitioners at the respective Clinic Defendants had active appropriate certification or licensure for the level of care being provided, never conducted systematic reviews of the Clinic Defendants' billings to ensure that the billings were not fraudulent or unlawful, and never even made any attempt to discover the fraudulent and unlawful charges submitted through the Clinic Defendants, much less take any immediate corrective action. See Fla. Stat. § 400.9935(1).

26.     In keeping with the fact that Merced never legitimately served as medical director at any of the individual Clinic Defendants, Merced simultaneously: (i) purported to serve as medical director at numerous other Florida clinics, including but not limited to each of the other Clinic Defendants, and (ii) purported to personally perform, or at least directly supervise, a massive number of individual health care services at numerous health care clinics and other medical practices throughout the Tampa area, including each of the other Clinic Defendants.

27.     It is improbable – to the point of impossibility – that Merced could have simultaneously fulfilled these various roles while also fulfilling his medical director role at any of the respective Clinic Defendants.

28.     The Clinic Owner Defendants used the façade of Merced's phony "appointment" as the respective Clinic Defendants' ersatz "medical director" to do indirectly what they were forbidden from doing directly – namely, and as set forth more fully herein: (i) to operate health care clinics without legitimate medical directors; (ii) to engage in unlicensed medical decision-making with respect to the Insureds who sought treatment at the Clinic Defendants; (iii) to permit health care services to be provided at the Clinic Defendants by individuals who lacked the proper

licensure to perform the services; and (iv) to use the Clinic Defendants as vehicles to submit a massive amount of fraudulent PIP billing to GEICO and other insurers.

29.     In fact, the only thing that Merced did during his phony tenure as the Clinic Defendants' fake "medical director" was to occasionally purport to perform the initial and follow-up examinations that were billed through the Clinic Defendants to GEICO and other insurers, and to sign bills and treatment reports prepared by the other Right Spinal Defendants at Right Spinal, the other Caribe Health Defendants at Caribe Health, the other Park Place Therapy Defendants at Park Place Therapy, the other Therapy Tampa Defendants at Therapy Tampa, and the other Bay Area Health Defendants at Bay Area Health.

30.     Merced unlawfully permitted the Clinic Owner Defendants to dictate every aspect of the manner in which Insureds would be treated at the respective Clinic Defendants, and to dictate every aspect of the manner in which health care services at the respective Clinic Defendants would be billed to GEICO and other insurers, because he sought to continue profiting from the fraudulent billing submitted through the Clinic Defendants.

**B.     The Fraudulent Misrepresentations Regarding the Identities of the Health Care Providers Rendering Services at the Clinic Defendants**

31.     Each of the Defendants caused GEICO to be billed for a limited range of Fraudulent Services, namely purported: (i) initial patient examinations; (ii) follow-up patient examinations; and (iii) physical therapy services. As set forth in Exhibits "1" – "5", the purported physical therapy services constituted the vast majority of the Fraudulent Services billed through each of the Clinic Defendants to GEICO.

32.     All of the "physical therapy" services that Defendants purported to provide between at least 2015 and the present were performed – to the extent that they were performed at all – by completely unsupervised massage therapists and/or physical therapist assistants, including: (i) Perez,

Garcia, and Veliz at Right Spinal; (ii) Chirino at Caribe Health; (iii) Lopez and Gonzalez at Park Place Therapy; (iv) Ramos at Therapy Tampa; and (v) Diaz and Figueroa at Bay Area Health.

33.     Perez, Garcia, Veliz, Lopez, Gonzalez, Ramos, Diaz, and Figueroa were only licensed as massage therapists, and Chirino was only licensed as a massage therapist and physical therapist assistant. Perez, Garcia, Veliz, Lopez, Gonzalez, Ramos, Diaz, Figueroa, and Chirino were never licensed as physical therapists.

34.     The Defendants were well-aware of the fact that the Clinic Defendants could not legally recover PIP Benefits for "physical therapy" or any other kinds of health care services performed by unsupervised massage therapists or physical therapist assistants such as Perez, Garcia, Veliz, Lopez, Gonzalez, Ramos, Diaz, Figueroa, and Chirino.

35.     Accordingly, in 2015, Merced, the Clinic Defendants, the Clinic Owner Defendants, Perez, Garcia, Veliz, Lopez, Gonzalez, Ramos, Diaz, Figueroa, and Chirino began to falsely represent – in virtually every single bill for "physical therapy" services that they submitted or caused to be submitted through the respective Clinic Defendants to GEICO – that Merced, a licensed physician, had either performed or supervised the putative physical therapy services.

36.     In reality, Merced neither performed nor supervised any of the physical therapy services that were billed through the respective Clinic Defendants to GEICO.

37.     In keeping with the fact that Merced neither performed nor directly supervised any of the physical therapy services that were billed through the Clinic Defendants to GEICO, Merced – who was in his late 70s to mid 80s at the time – often purported to personally perform or directly supervise more than 20, 30, 40, or even 50 hours of "physical therapy" services for GEICO Insureds on individual dates, often at several of the Clinic Defendants, and at several different locations, per day.

11

38.     It is improbable, to the point of impossibility, that Merced – who was advanced in age at the time, and simultaneously working or purporting to work at various other medical practices and clinics – routinely performed such a high volume of physical therapy services on individual dates, often at multiple of the Clinic Defendants on individual dates.

39.     Upon information and belief, the fraudulent billing for physical therapy services that the Defendants submitted or caused to be submitted through the respective Clinic Defendants to GEICO constituted only a fraction of the <u>total</u> fraudulent billing for physical therapy services that the Defendants submitted through the respective Clinic Defendants to <u>all</u> of the automobile insurers in the Florida automobile insurance market.

40.     It is extremely improbable, to the point of impossibility, that the Defendants only submitted fraudulent billing to GEICO, and that the Defendants did not simultaneously bill other automobile insurers.

41.     Thus, upon information and belief, the impossible number of physical therapy services that Merced purported to directly supervise or perform for GEICO Insureds at the Clinic Defendants on individual dates of service constituted only a fraction of the <u>total</u> number of physical therapy services that Merced purported to directly supervise or perform at the Clinic Defendants, including for individuals insured by companies other than GEICO, on those same dates of service.

42.     In keeping with the fact that Merced never legitimatefully fulfilled his required duties as "medical director" at any of the Clinic Defendants, each of the claims submitted by Defendants for physical therapy services identified in Exhibits "1" – "5" falsely represented that Merced had performed or at least directly supervised the underlying physical therapy services, so as to create the false appearance that the services were eligible for PIP reimbursement. In fact, the underlying physical therapy services were not eligible for PIP reimbursement, because they had been performed

– to the extent they were performed at all – by completely unsupervised massage therapists and/or physcial therapist assistants, including: (i) Perez, Garcia, and Veliz at Right Spinal; (ii) Chirino at Caribe Health; (iii) Lopez and Gonzalez at Park Place Therapy; (iv) Ramos at Therapy Tampa; and (v) Diaz and Figueroa at Bay Area Health.

43.    In the claims for physical therapy services identified in Exhibits "1" – "5", the Defendants routinely fraudulently misrepresented that the physical therapy services were lawfully provided and reimbursable, when in fact they were neither lawfully provided nor reimbursable, because:

(i)    the putative physical therapy services were illegally performed – to the extent they were performed at all – by massage therapists and/or physical therapist assistants, without any supervision by anyone, in contravention of Florida law;

(ii)    the respective Clinic Defendants could not lawfully recover PIP Benefits for the putative physical therapy services, because they were performed by completely unsupervised massage therapists and/or physical therapist assistants in contravention of Florida law; and

(iii)    the Defendants systematically fraudulently misrepresented that the physical therapy services were legitimately performed or supervised by Merced.

**C.    The Defendants' Fraudulent Treatment and Billing Protocols**

44.    In the claims identified in Exhibits "1" - "5", virtually none of the Insureds whom the Defendants purported to treat suffered from any significant injuries or health problems as a result of the relatively minor accidents they experienced or purported to experience.

45.    Even so – and in keeping with the fact that Merced never legitimately served as medical director at any of the Clinic Defendants – the Defendants purported to subject virtually every Insured to a medically unnecessary course of "treatment" pursuant to pre-determined, fraudulent protocols designed to maximize the billing that they could submit to insurers, including GEICO, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them.

1.      **The Fraudulent Claims for Initial Examinations**

46.     As an initial step in the Defendants' fraudulent treatment and billing protocols, each of the Insureds in the claims identified in Exhibits "1" - "5" purportedly received an initial examination at the respective Clinic Defendants, with:

(i)     Merced purporting to personally perform or directly supervise most of the initial examinations at Caribe Health, Park Place Therapy, Therapy Tampa, and Bay Area Health; and

(ii)    Merced, Duldulao, Silva, and Diamantides purporting to personally perform or directly supervise virtually all of the initial examinations at Right Spinal.

47.     The purported initial examinations then were billed to GEICO in the following manner:

(i)     In the claims identified in Exhibit "1", Right Spinal, Mora-Jimenez, Merced, Duldulao, Silva, and Diamantides billed GEICO under CPT codes 99203 or 99204 for each initial examination that Merced, Duldulao, Silva, and Diamantides purportedly provided at Right Spinal.

(ii)    In the claims identified in Exhibit "2", Caribe Health, Dominguez, and Merced billed GEICO under CPT code 99204 for each initial examination that Merced purportedly provided at Caribe Health.

(iii)   In the claims identified in Exhibit "3", Park Place Therapy, Lopez, and Merced billed GEICO under CPT code 99203 for each initial examination that Merced purportedly provided at Park Place Therapy.

(iv)    In the claims identified in Exhibit "4", Therapy Tampa, Ulloa, Rodriguez, and Merced billed GEICO under CPT code 99204 for each initial examination that Merced purportedly provided at Therapy Tampa.

(v)     In the claims identified in Exhibit "5", Bay Area Health, Reyes, and Merced billed GEICO under CPT code 99204 for each initial examination that Merced purportedly provided at Bay Area Health.

48.     Pursuant to the American Medical Association's CPT Assistant, which governs reimbursement of PIP claims:

(i)     the use of CPT code 99203 to bill for an initial patient examination represents – among other things – that: (a) the patient presented with problems of moderate severity; (b) the physician who conducted the examination spent at least 30 minutes

of face-to-face time with the patient or the patient's family during the examination; (c) the physician who performed the examination conducted a "detailed" physical examination; and (d) the physician who performed the examination engaged in "low complexity" medical decision-making; and

(ii)     the use of CPT code 99204 to bill for an initial patient examination represents – among other things – that: (a) the patient presented with problems of moderate to high severity; (b) the physician who conducted the examination spent at least 45 minutes of face-to-face time with the patient or the patient's family during the examination; (c) the physician who performed the examination conducted a "comprehensive" physical examination; and (d) the physician who performed the examination engaged in "moderate complexity" medical decision-making.

49.     As set forth below, the charges for the initial examinations identified in Exhibits "1" - "5" were fraudulent in that they misrepresented the nature, extent, and results of the initial examinations.

**(i)     Misrepresentations Regarding the Severity of the Insureds' Presenting Problems**

50.     To the extent that the Insureds in the claims identified in Exhibits "1" - "5" had any presenting problems at all as the result of their typically-minor automobile accidents, the problems virtually always were low or minimal severity soft tissue injuries such as sprains and strains.

51.     For instance, in the vast majority of the claims identified in Exhibits "1" - "5" the Insureds did not seek treatment at any hospital as the result of their accidents. To the limited extent that the Insureds in the claims identified in Exhibits "1" - "5" did seek treatment at a hospital following their accidents, they virtually always were briefly observed on an outpatient basis, and discharged with nothing more serious than a minor soft tissue injury diagnosis.

52.     Furthermore, in the substantial majority of the claims identified in Exhibits "1" - "5", contemporaneous police reports indicated that the underlying accidents involved low-speed, low-impact collisions, that the Insureds' vehicles were functional following the accidents, and that no one was seriously injured in the accidents, or injured at all.

53.     Even so, in the claims for initial examinations identified in Exhibits "1" - "5", Merced, the Clinic Defendants, the Clinic Owner Defendants, Duldulao, Silva, and Diamantides made the following misrepresentations:

(i)     When billing GEICO for putative initial examinations using CPT code 99203 in the claims identified in Exhibits "1" and "3", Merced, Right Spinal, Park Place Therapy, Mora-Jimenez, Lopez, Duldulao, Silva, and Diamantides falsely represented that the Insureds presented with problems of moderate severity, when in fact the Insureds' problems were low or minimal severity soft tissue injuries such as sprains and strains, to the limited extent that they had any presenting problems at all.

(ii)    When billing GEICO for putative initial examinations using CPT code 99204 in the claims identified in Exhibits "1", "2", "4", and "5", Merced, Right Spinal, Mora-Jimenez, Duldulao, Silva, Diamantides, Caribe Health, Dominguez, Therapy Tampa, Ulloa, Rodriguez, Bay Area Health, and Reyes falsely represented that the Insureds presented with problems of moderate to high severity, when in fact the Insureds' problems were low or minimal severity soft tissue injuries such as sprains and strains, to the limited extent that they had any presenting problems at all.

54.     In the claims for initial examinations identified in Exhibits "1" - "5", Merced, the Clinic Defendants, the Clinic Owner Defendants, Duldulao, Silva, and Diamantides routinely falsely represented that the Insureds presented with problems of either moderate severity or moderate to high severity in order to: (i) create a false basis for their charges for the examinations under CPT codes 99203 or 99204, because examinations billable under CPT codes 99203 and 99204 are reimbursable at higher rates than examinations involving presenting problems of low severity, minimal severity, or no severity; and (ii) create a false basis for the laundry list of other Fraudulent Services that the Defendants purported to provide to the Insureds.

**(ii)   Misrepresentations Regarding "Detailed" and "Comprehensive" Physical Examinations**

55.     In addition, in the claims for initial examinations identified in Exhibits "1" - "5", when Merced, the Clinic Defendants, the Clinic Owner Defendants, Duldulao, Silva, and Diamantides billed GEICO for putative initial examinations, they made the following

16

misrepresentations regarding the nature and extent of the physical examinations that Merced, Duldulao, Silva, and Diamantides provided to the Insureds:

(i)     When billing GEICO for putative initial examinations using CPT code 99203 in the claims identified in Exhibits "1" and "3", Merced, Right Spinal, Park Place Therapy, Mora-Jimenez, Lopez, Duldulao, Silva, and Diamantides falsely represented that the physicians who purported to conduct the examinations – namely Merced, Duldulao, Silva, and Diamantides – conducted "detailed" physical examinations of the Insureds who purportedly received the examinations.

(ii)    When billing GEICO for putative initial examinations using CPT code 99204 in the claims identified in Exhibits "1", "2", "4", and "5", Merced, Right Spinal, Mora-Jimenez, Duldulao, Silva, Diamantides, Caribe Health, Dominguez, Therapy Tampa, Ulloa, Rodriguez, Bay Area Health, and Reyes falsely represented that the physicians who purported to conduct the examinations – namely Merced, Duldulao, Silva, and Diamantides – conducted "comprehensive" physical examinations of the Insureds who purportedly received the examinations.

56.     In fact, with respect to the claims for initial examinations under CPT code 99203 that are identified in Exhibits "1" and "3", neither Merced, Duldulao, Silva, Diamantides, nor any other physician associated with Right Spinal or Park Place Therapy ever conducted a "detailed" patient examination because: (i) pursuant to the CPT Assistant, a "detailed" physical examination requires – among other things – that the physician performing the examination document an extended examination of the affected body areas and other symptomatic or related organ systems; but (ii) neither Merced, Duldulao, Silva, Diamantides, nor any other physician associated with Right Spinal or Park Place Therapy ever documented an extended examination of the Insureds' musculoskeletal systems or any of the Insureds' other systems.

57.     Additionally, with respect to the claims for initial examinations under CPT code 99204 that are identified in Exhibits "1", "2", "4", and "5", neither Merced, Duldulao, Silva, Diamantides, nor any other physician associated with Right Spinal, Caribe Health, Therapy Tampa, or Bay Area Health ever conducted a "comprehensive" patient examination because: (i) pursuant to the CPT Assistant, a "comprehensive" physical examination requires – among other

things – that the physician performing the examination document a general examination of multiple patient organ systems or a complete examination of a single patient organ system; but (ii) neither Merced, Duldulao, Silva, Diamantides, nor any other physician associated with Right Spinal, Caribe Health, Therapy Tampa, or Bay Area Health ever documented a general examination of multiple patient organ systems or a complete examination of a single patient organ system.

58.     In the claims for initial examinations identified in Exhibits "1" - "5", Merced, the Clinic Defendants, the Clinic Owner Defendants, Duldulao, Silva, and Diamantides routinely falsely represented that they provided either "detailed" or "comprehensive" physical examinations to the Insureds in order to create a false basis for their charges for the examinations under CPT codes 99203 or 99204, because examinations billable under CPT codes 99203 and 99204 are reimbursable at higher rates than examinations that are neither "detailed" nor "comprehensive".

**(iii)     Misrepresentations Regarding the Extent of Medical Decision-Making**

59.     Moreover, in the claims for initial examinations identified in Exhibits "1" - "5", when Merced, the Clinic Defendants, the Clinic Owner Defendants, Duldulao, Silva, and Diamantides billed GEICO for putative initial examinations, they made the following misrepresentations regarding the extent of medical decision-making that was required in connection with the examinations:

(i)     When billing GEICO for putative initial examinations using CPT code 99203 in the claims identified in Exhibits "1" and "3", Merced, Right Spinal, Park Place Therapy, Mora-Jimenez, Lopez, Duldulao, Silva, and Diamantides falsely represented that the physicians who purported to conduct the examinations – namely Merced, Duldulao, Silva, and Diamantides – engaged in some legitimate, low complexity medical decision-making in connection with the examinations.

(ii)     When billing GEICO for putative initial examinations using CPT code 99204 in the claims identified in Exhibits "1", "2", "4", and "5", Merced, Right Spinal, Mora-Jimenez, Duldulao, Silva, Diamantides, Caribe Health, Dominguez, Therapy Tampa, Ulloa, Rodriguez, Bay Area Health, and Reyes falsely represented that the physician who purported to conduct the examinations – namely Merced, Duldulao,

Silva, and Diamantides – engaged in some legitimate, moderate complexity medical decision-making in connection with the examinations.

60.     In actuality, the purported initial examinations did not involve any legitimate medical decision-making at all.

61.     For example, in the claims for initial examinations identified in Exhibits "1" - "5": (i) the initial examinations did not involve the retrieval, review, or analysis of any meaningful amount of medical records, diagnostic tests, or other information; (ii) there was no risk of significant complications or morbidity – much less mortality – from the Insureds' minor soft-tissue injury complaints, to the extent that they ever had any complaints arising from automobile accidents at all; and (iii) Merced, Duldulao, Silva, and Diamantides did not consider any significant number of diagnoses or treatment options for Insureds during the initial examinations, and instead – at the direction of the respective Clinic Defendants and Clinic Owner Defendants – provided a nearly identical, pre-determined sprain/strain or similar soft tissue injury "diagnosis" for every Insured, and falsely diagnosed virtually every Insured as having an "emergency medical condition".

62.     In keeping with the fact that these putative "diagnoses" were pre-determined and phony, Merced, Duldulao, Silva, and Diamantides – at the direction of the respective Clinic Defendants and Clinic Owner Defendants – frequently issued substantially identical, phony "diagnoses", on or about the same date, to two, three, four, or even five Insurerds who had been involved in a the same underlying accident, and recommended a substantially identical course of medically unnecessary "treatment" to the Insureds, despite the fact that they were differently situated.

63.     Based on these phony and pre-determined soft tissue injury "diagnoses", virtually every Insured was directed to return to one of the Clinic Defendants several times each week for medically unnecessary "physical therapy", which was performed – to the extent that it was

performed at all – by completely unsupervised massage therapists and/or physical therapist assistants, including: (i) Perez, Garcia, and Veliz at Right Spinal; (ii) Chirino at Caribe Health; (iii) Lopez and Gonzalez at Park Place Therapy; (iv) Ramos at Therapy Tampa; and (v) Diaz and Figueroa at Bay Area Health.

64.     The false "diagnoses" contained within the initial examination reports were included to give the false impression that the initial examinations entailed some legitimate medical decision-making, to create a false basis for the charges under CPT codes 99203 and 99204, and to create a false justification for the other Fraudulent Services that the Defendants purported to provide to the Insureds.

65.     In the claims for initial examinations identified in Exhibits "1" – "5", Merced, the Clinic Defendants, the Clinic Owner Defendants, Duldulao, Silva, and Diamantides routinely fraudulently misrepresented that the examinations were lawfully provided and eligible for PIP reimbursement, when in fact they were neither lawfully provided nor reimbursable, because:

(i)     the putative examinations were illusory, with outcomes that were pre-determined to result in substantially-identical, phony "diagnoses" and treatment recommendations, regardless of the Insureds' true individual circumstances and presentation;

(ii)    the charges for the putative examinations misrepresented the nature and extent of the examinations; and

(iii)   the Clinic Defendants never were eligible to collect PIP Benefits in connection with the examinations in the first instance, inasmuch as they unlawfully were operated without legitimate medical directors.

66.     In this context, Merced – who at all relevant times purported to serve as the "medical director" at the Clinic Defendants – did not, and could not have, "[c]onduct[ed] systematic reviews of clinic billings to ensure that the billings are not fraudulent or unlawful." *See*

Fla. Stat. § 400.9935(1). Had Merced done so, he would have observed and put a stop to these fraudulent charges for initial examinations.

**2.      The Fraudulent Claims for Follow-Up Examinations**

67.     In addition to the fraudulent initial examinations, most of the Insureds in the claims identified in Exhibits "1" - "5" purportedly received multiple, fraudulent follow-up examinations at the respective Clinic Defendants, with:

(i)      Merced purporting to personally perform or directly supervise virtually all of the follow-up examinations at Park Place Therapy and Bay Area Health;

(ii)     Merced and Mathieson purporting to personally perform or directly supervise virtually all of the follow-up examinations at Therapy Tampa;

(iii)    Merced and Diamantides purporting to personally perform or directly supervise virtually all of the follow-up examinations at Right Spinal; and

(iv)     Mathieson purporting to personally perform or directly supervise most of the follow-up examinations at Caribe Health.

68.     The purported follow-up examinations then were billed to GEICO in the following manner:

(i)      In the claims identified in Exhibit "1", Right Spinal, Mora-Jimenez, Merced, and Diamantides billed GEICO under CPT codes 99213 or 99214 for each follow-up examination that Merced and Diamantides purportedly provided at Right Spinal.

(ii)     In the claims identified in Exhibit "2", Caribe Health, Dominguez, and Merced billed GEICO under CPT codes 99213 or 99215 for each follow-up examination that Mathieson purportedly provided at Caribe Health.

(iii)    In the claims identified in Exhibit "3", Park Place Therapy, Lopez, and Merced billed GEICO under CPT codes 99213 or 99214 for each follow-up examination that Merced purportedly provided at Park Place Therapy.

(iv)     In the claims identified in Exhibit "4", Therapy Tampa, Ulloa, Rodriguez, and Merced billed GEICO under CPT codes 99213 or 99214 for each follow-up examination that Merced and Mathieson purportedly provided at Therapy Tampa.

(v)      In the claims identified in Exhibit "5", Bay Area Health, Reyes, and Merced billed GEICO under CPT code 99214 for each follow-up examination that Merced purportedly provided at Bay Area Health.

69.     Pursuant to the CPT Assistant, the use of CPT code 99213 to bill for a follow-up examination represents – among other things – that: (i) the patient presented with problems of low to moderate severity; and (ii) the physician performed at least two of the following three components during the examination: (a) took an "expanded problem focused" patient history; (b) conducted an "expanded problem focused physical examination"; and (c) engaged in medical decision-making of "low complexity".

70.     Pursuant to the CPT Assistant, the use of CPT code 99214 to bill for a follow-up examination represents – among other things – that: (i) the patient presented with problems of moderate to high severity; and (ii) the physician performed at least two of the following three components during the examination: (a) took a "detailed" patient history; (b) conducted a "detailed" physical examination; and (c) engaged in medical decision-making of "moderate complexity".

71.     Pursuant to the CPT Assistant, the use of CPT code 99215 to bill for a follow-up examination represents – among other things – that: (i) the patient presented with problems of moderate to high severity; and (ii) the physician performed at least two of the following three components during the examination: (a) took a "comprehensive" patient history; (b) conducted a "comprehensive" physical examination; and (c) engaged in medical decision-making of "high complexity".

72.     As set forth below, the charges for the follow-up examinations identified in Exhibits "1" – "5" misrepresented the nature, extent, and results of the follow-up examinations.

**(i)     Misrepresentations Regarding the Severity of the Insureds' Presenting Problems**

73.     To the extent that the Insureds in the claims identified in Exhibits "1" - "5" suffered any injuries at all in their automobile accidents, the injuries almost always were minor soft tissue injuries such as sprains and strains, which were of low or minimal severity, even at their onset.

74.     Minor soft tissue injuries such as strains and sprains virtually always resolve after a short course of conservative treatment or no treatment at all. By the time the Insureds in the claims identified in Exhibits "1" - "5" presented for their putative follow-up examinations – typically weeks after their minor accidents – the Insureds either did not have any genuine presenting problems at all as the result of their minor automobile accidents, or else their presenting problems were minimal.

75.     Even so, in the claims for the follow-up examinations identified in Exhibits "1" - "5", Merced, the Clinic Defendants, the Clinic Owner Defendants, and Diamantides made the following misrepresentations:

(i)     When billing GEICO for putative follow-up examinations using CPT code 99213 in the claims identified in Exhibits "1", "2", "3", and "4", Merced, Right Spinal, Caribe Health, Park Place Therapy, Therapy Tampa, Mora-Jimenez, Dominguez, Lopez, Ulloa, Rodriguez, and Diamantides falsely represented that the Insureds presented with problems of low to moderate severity, when in fact the Insureds' problems were minimal severity soft tissue injuries such as sprains and strains, to the limited extent that they had any presenting problems at all.

(ii)    When billing GEICO for putative follow-up examinations using CPT code 99214 in the claims identified in Exhibits "1", "3", "4", and "5", Merced, Right Spinal, Park Place Therapy, Therapy Tampa, Bay Area Health, Mora-Jimenez, Lopez, Ulloa, Rodriguez, Reyes, Merced, and Diamantides falsely represented that the Insureds presented with problems of moderate to high severity, when in fact the Insureds' problems minimal severity soft tissue injuries such as sprains and strains, to the limited extent that they had any presenting problems at all.

(iii)   When billing GEICO for putative follow-up examinations using CPT code 99215 in the claims identified in Exhibit "2", Merced, Caribe Health, and Dominguez falsely represented that the Insureds presented with problems of moderate to high severity, when in fact the Insureds' problems were minimal severity soft tissue injuries such as sprains and strains, to the limited extent that they had any presenting problems at all.

76.     In the claims for follow-up examinations identified in Exhibits "1" - "5", Merced, the Clinic Defendants, the Clinic Owner Defendants, and Diamantides routinely falsely represented that the Insureds presented with problems of either low to moderate severity or moderate to high severity in order to: (i) create a false basis for their charges for the examinations under CPT codes

99213, 99214, or 99215, because examinations billable under CPT codes 99213, 99214, and 99215 are reimbursable at higher rates than examinations involving presenting problems of minimal severity, or no severity; and (ii) create a false basis for the laundry list of other Fraudulent Services that the Defendants purported to provide to the Insureds.

**(ii)    Misrepresentations Regarding the Nature, Extent, and Results of the Follow-Up Examinations**

77.    What is more, in the claims for follow-up examinations identified in Exhibits "1" - "5", neither Merced, Diamantides, Mathieson, nor any other physician or chiropractor associated with the Clinic Defendants ever took any legitimate patient histories, conducted any legitimate physical examinations, or engaged in any legitimate medical decision-making at all.

78.    Rather, following the purported follow-up examinations, Merced, Diamantides, and Mathieson – at the direction of the respective Clinic Defendants and Clinic Owner Defendants – simply: (i) reiterated the false, boilerplate "diagnoses" from the Insureds' initial examinations; and either (ii) referred the Insureds for even more medically unnecessary physical therapy services, despite the fact that the Insureds purportedly already had received extensive physical therapy services that supposedly had not been successful in resolving their purported pain symptoms; or (iii) discharged the Insureds from "treatment", to the extent that their PIP Benefits had been exhausted.

79.    The phony "follow-up examinations" that Merced, the Clinic Defendants, the Clinic Owner Defendants, Diamantides, and Mathieson purported to provide to the Insureds in the claims identified in Exhibits "1" - "5" therefore were medically useless, and played no legitimate role in the treatment or care of the Insureds, because the putative "results" of the examinations were prearranged to comport with the medically unnecessary treatment plan that was pre-determined for each Insured from the moment they walked into the Clinic Defendants' offices.

80.     Additionally, Right Spinal, Mora-Jimenez, and Merced routinely billed GEICO for multiple putative follow-up examinations under CPT code 99211 contemporaneous with their supposed provision of physical therapy treatment.

81.     However, these supposed "examinations" were never truly separate services from the putative physical therapy services.

82.     Instead, Right Spinal, Mora-Jimenez, and Merced billed GEICO for the illusory follow-up examinations under CPT code 99211 in order to maximize the fraudulent billing they submitted to GEICO.

83.     In keeping with the fact that the follow-up examinations purportedly provided contemporaneous with the physical therapy services were illusory, Right Spinal, Mora-Jimenez, and Merced never submitted any reports, notes, or any substantiating documentation whatsoever in connection with the phony follow-up examinations billed under CPT code 99211.

84.     Even so, Right Spinal, Mora-Jimenez, and Merced routinely submitted duplicative charges under CPT code 99211 for illusory follow-up examinations contemporaneous with charges for putative physical therapy services.

85.     In the claims for follow-up examinations identified in Exhibits "1" - "5", Merced, the Clinic Defendants, the Clinic Owner Defendants, and Diamantides routinely fraudulently misrepresented that the examinations were lawfully provided and reimbursable, when in fact they were neither lawfully provided nor reimbursable, because:

(i)     the putative examinations were illusory, with outcomes that were pre-determined to result in substantially-identical, phony "diagnoses" and treatment recommendations, regardless of the Insureds' true individual circumstances and presentation;

(ii)    the charges for the putative examinations misrepresented the nature and extent of the examinations; and

(iii)     the Clinic Defendants never were eligible to collect PIP Benefits in connection with the examinations in the first instance, inasmuch as they unlawfully were operated without legitimate medical directors.

**3.     The Fraudulent Claims for "Physical Therapy"**

86.     In keeping with the fact that the purported "results" of the follow-up examinations were pre-determined, and had no legitimate connection to the Insureds' true medical circumstances or presentation:

(i)     The Right Spinal Defendants caused the majority of Insureds in the claims identified in Exhibit "1" to receive three to six weeks of substantially identical "physical therapy" treatments, regardless of the purported "outcome" of the examinations and previous physical therapy treatments, including: (a) hot/cold packs; (b) mechanical traction; (c) paraffin baths; (d) electrical stimulation therapy; (e) ultrasound therapy; (f) therapeutic exercises; (g) neuromuscular reeducation; (h) therapeutic activity; and (i) low-level laser therapy.

(ii)     The Caribe Health Defendants caused the majority of Insureds in the claims identified in Exhibit "2" to receive three to six weeks of substantially identical "physical therapy" treatments, regardless of the purported "outcome" of the examinations and previous physical therapy treatments, including: (a) hot/cold packs; (b) mechanical traction; (c) paraffin bath; (d) electrical stimulation; (e) contrast baths; (f) ultrasound therapy; (g) therapeutic exercises; (h) neuromuscular reeducation; and (i) low-level laser treatment.

(iii)     The Park Place Therapy Defendants caused the majority of Insureds in the claims identified in Exhibit "3" to receive four to six weeks of substantially identical "physical therapy" treatments, regardless of the purported "outcome" of the examinations and previous physical therapy treatments, including: (a) mechanical traction; (b) electrical stimulation therapy; (c) ultrasound therapy; and (d) therapeutic exercises.

(iv)     The Therapy Tampa Defendants caused the majority of Insureds in the claims identified in Exhibit "4" to receive three to six weeks of substantially identical "physical therapy" treatments, regardless of the purported "outcome" of the examinations and previous physical therapy treatments, including: (a) hot/cold packs; (b) mechanical traction; (c) paraffin baths; (d) electrical stimulation therapy; (e) ultrasound therapy; and (f) therapeutic exercises.

(v)     The Bay Area Health Defendants caused the majority of Insureds in the claims identified in Exhibit "5" to receive four to six weeks of substantially identical "physical therapy" treatments, regardless of the purported "outcome" of the examinations and previous physical therapy treatments, including: (a) cold/hot

packs; (b) therapeutic exercises and activities; (c) infrared treatment; (d) ultrasound; (e) neuromuscular reeducation; and (f) electric stimulation.

87.    In a legitimate clinical setting, each individual patient's physical therapy schedule, and the specific physical therapy modalities that will be used, must be tailored to the specific patient's circumstances, symptomatology, and presentation.

88.    In a legitimate clinical setting, the nature of, extent of, and schedule for physical therapy is constantly adjusted for each individual patient based on each patient's individual treatment progress, as assessed during each patient's follow-up examinations and on an ongoing basis as they receive the physical therapy.

89.    By contrast, at each of the Clinic Defendants, the nature and extent of the physical therapy that each Insured purportedly received was pre-determined, and had no legitimate connection to the Insureds' individual circumstances, presentation, or progress through the Defendants' fraudulent treatment and billing protocols. The purported "physical therapy" provided through each of the Clinic Defendants to GEICO Insureds therefore was medically useless.

90.    In keeping with the fact that the "physical therapy" services billed through Caribe Health to GEICO were pre-determined, fraudulent, and unlawful, Robiner – who worked at Caribe Health between mid-2016 and mid-2018 – swore in a June 8, 2020 affidavit that he quit working at Caribe Health in 2018 after he discovered that his examination reports at Caribe Health had been fraudulently altered without his knowledge or consent, to make it appear as if he had directed the patients to receive mechanical traction, therapeutic exercises, and neuromuscular reeducation, when in fact Robiner had not prescribed or recommended these services, and when in fact Caribe Health did not even have the equipment necessary to provide mechanical traction or therapeutic exercises.

91.     Furthermore, in the claims for physical therapy services identified in Exhibits "1" - "5", the charges were fraudulent, unlawful, and non-reimbursable because the billing falsely represented that Merced had performed or directly supervised the services, when in fact the "physical therapy" services were performed – to the extent that they were performed at all – by completely unsupervised massage therapists and/or physical therapist assistants associated with each of the Clinic Defendants, including: (i) Perez, Garcia, and Veliz at Right Spinal; (ii) Chirino at Caribe Health; (iii) Lopez and Gonzalez at Park Place Therapy; (iv) Ramos at Therapy Tampa; and (v) Diaz and Figueroa at Bay Area Health. Then

## III.    The Fraudulent Claims the Defendants Submitted or Caused to be Submitted to GEICO

92.     To support their fraudulent charges, the Defendants systematically submitted or caused to be submitted thousands of HCFA-1500 forms, PIP charges, and treatment reports through the Clinic Defendants to GEICO, containing thousands of individual charges, seeking payment for the Fraudulent Services that the Defendants were not entitled to receive. In particular:

(i)     The Right Spinal Defendants submitted or caused to be submitted thousands of HCFA-1500 forms, PIP charges, and treatment reports through Right Spinal to GEICO;

(ii)    The Caribe Health Defendants submitted or caused to be submitted thousands of HCFA-1500 forms, PIP charges, and treatment reports through Caribe Health to GEICO;

(iii)   The Park Place Therapy Defendants submitted or caused to be submitted thousands of HCFA-1500 forms, PIP charges, and treatment reports through Park Place Therapy to GEICO;

(iv)    The Therapy Tampa Defendants submitted or caused to be submitted thousands of HCFA-1500 forms, PIP charges, and treatment reports through Therapy Tampa to GEICO; and

(v)     The Bay Area Health Defendants submitted or caused to be submitted thousands of HCFA-1500 forms, PIP charges, and treatment reports through Bay Area Health to GEICO.

93.     The claims that the Defendants submitted or caused to be submitted to GEICO were

false and misleading in the following, material respects:

(i)     The HCFA-1500 forms and treatment reports submitted or caused to be submitted by the Defendants uniformly misrepresented to GEICO that the Clinic Defendants were in compliance with the Clinic Act and eligible to collect PIP Benefits in the first instance. In fact, the Clinic Defendants never were in compliance with the Clinic Act, and never were eligible to collect PIP Benefits, because they were operated without legitimate medical directors who legitimately fulfilled the statutory requirements applicable to clinic medical directors.

(ii)    The HCFA-1500 forms and treatment reports submitted or caused to be submitted by the Defendants uniformly misrepresented to GEICO that the Fraudulent Services were lawfully provided and eligible for PIP reimbursement. In fact, the Fraudulent Services were not lawfully provided, and were not eligible for PIP reimbursement, because: (a) they were medically unnecessary and provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; and (b) in the case of the "physical therapy" services, because they were provided by unsupervised massage therapists and/or physical therapist assistants, and because the claims misrepresented the identities of the actual treating providers.

(iii)   The HCFA-1500 forms and treatment reports submitted or caused to be submitted by the Defendants uniformly misrepresented to GEICO that the Fraudulent Services were medically necessary and, in many cases, misrepresented to GEICO that the Fraudulent Services actually were performed. In fact, the Fraudulent Services frequently were not performed at all and, to the extent that they were performed, they were not medically necessary and were performed as part of a pre-determined fraudulent treatment and billing protocol designed solely to financially enrich the Defendants, not to benefit the Insureds who supposedly were subjected to them.

(iv)    The HCFA-1500 forms and treatment reports submitted by and on behalf of the Defendants frequently misrepresented and exaggerated the level of the Fraudulent Services and the nature of the Fraudulent Services that purportedly were provided.

## IV.    <u>The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance</u>

94.     The Defendants were legally and ethically obligated to act honestly and with integrity

in connection with their performance of the Fraudulent Services and their submission of charges to

GEICO. Even so, the Defendants knowingly misrepresented and concealed facts related to the Clinic

Defendants in an effort to prevent discovery: (i) that the Clinic Defendants lacked legitimate medical directors, and therefore were ineligible to collect PIP Benefits in the first instance; (ii) that the Fraudulent Services were provided – to the extent that they were provided at all – by unsupervised massage therapists and/or physical therapist assistants, and therefore were not eligible for PIP reimbursement; and (iii) that the Fraudulent Services were medically unnecessary.

95.     GEICO is under statutory and contractual obligations to promptly and fairly process claims within 30 days. The facially-valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and acts of concealment described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO has incurred damages of more than $3,100,000.00.

96.     GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it commenced this action.

## FIRST CAUSE OF ACTION
### Against Right Spinal, Caribe Health, Park Place Therapy, Therapy Tampa, and Bay Area Health
### (Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)

97.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-96 above.

98.     There is an actual case in controversy between GEICO and the Clinic Defendants regarding more than $75,000.00 in pending fraudulent claims for the Fraudulent Services that have been submitted to GEICO.

99.     The Clinic Defendants have no right to receive payment for any pending bills submitted to GEICO because they unlawfully were operated in violation of the Clinic Act's medical director and operating requirements.

100.    The Clinic Defendants have no right to receive payment for any pending bills submitted to GEICO because the underlying Fraudulent Services were not lawfully provided or billed to GEICO.

101.    The Clinic Defendants have no right to receive payment for any pending bills submitted to GEICO because the underlying Fraudulent Services were not performed by individuals who actually were licensed to perform the pertinent services, or else constituted non-reimbursable massage.

102.    The Clinic Defendants have no right to receive payment for any pending bills submitted to GEICO because the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them.

103.    The Clinic Defendants have no right to receive payment for any pending bills submitted to GEICO because, in many cases, the Fraudulent Services never were provided in the first instance.

104.    The Clinic Defendants have no right to receive payment for any pending bills submitted to GEICO because the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

105.    Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Right Spinal, Caribe Health, Park Place Therapy, Therapy Tampa and Bay Area Health have no right to receive payment for any pending bills submitted to GEICO.

## SECOND CAUSE OF ACTION
### Against Mora-Jimenez and Merced
### (Violation of RICO, 18 U.S.C. § 1962(c))

106.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-89 and 91-96, above.

107.    Right Spinal is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

108.    Mora-Jimenez and Merced knowingly have conducted and/or participated, directly or indirectly, in the conduct of Right Spinal's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over two years seeking payments that Right Spinal was not eligible to receive under the No-Fault Law because: (i) Right Spinal unlawfully was operated in violation of the Clinic Act's medical director and licensing requirements; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Right Spinal Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

109.    A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1".

110.    Right Spinal's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Mora-Jimenez and Merced operated Right Spinal, inasmuch as Right Spinal was not engaged in a legitimate healthcare practice, and acts of mail fraud therefore were essential in order for Right Spinal to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Right Spinal Defendants continue to attempt collection on the fraudulent billing submitted through Right Spinal to the present day.

111.    Right Spinal is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Right Spinal in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

112.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,600,000.00 pursuant to the fraudulent bills submitted through the Right Spinal enterprise.

113.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**THIRD CAUSE OF ACTION**
**Against Mora-Jimenez, Merced, Duldulao, Silva, Diamantides, Perez, Garcia, and Veliz**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

114.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-89 and 91-96, above.

115.    Right Spinal is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

116.    Mora-Jimenez, Merced, Duldulao, Silva, Diamantides, Perez, Garcia, and Veliz are or were employed by or associated with the Right Spinal enterprise.

117.    Mora-Jimenez, Merced, Duldulao, Silva, Diamantides, Perez, Garcia, and Veliz knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of Right Spinal's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over two years seeking payments that Right Spinal was not eligible to receive under the No-Fault Law because: (i) Right Spinal unlawfully was operated in violation of the Clinic Act's medical director and licensing requirements; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Right Spinal Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented

and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

118.    A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1". Each such mailing was made in furtherance of the mail fraud scheme.

119.    Mora-Jimenez, Merced, Duldulao, Silva, Diamantides, Perez, Garcia, and Veliz knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other automobile insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

120.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,600,000.00 pursuant to the fraudulent bills submitted through the Right Spinal enterprise.

121.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## FOURTH CAUSE OF ACTION
### Against the Right Spinal Defendants
### (Under Fla. Stat. 501.201 et. seq.)

122.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-89 and 91-96, above.

123.    The Right Spinal Defendants are actively engaged in trade and commerce in the State of Florida.

124.    GEICO and its Insureds are "consumers" as defined by Fla. Stat. 501.203.

125. The Right Spinal Defendants engaged in unfair, deceptive, and unconscionable acts or trade practices in their trade or commerce in the pursuit and execution of their scheme to illegally obtain PIP Benefits from GEICO.

126. The bills and supporting documents submitted or caused to be submitted by the Right Spinal Defendants to GEICO were fraudulent in that they misrepresented: (i) Right Spinal's eligibility to collect PIP Benefits in the first instance; (ii) that the Fraudulent Services were lawfully provided and billed to GEICO; (iii) that the Fraudulent Services were medically necessary; and (iv) that the Fraudulent Services actually were performed in the first instance.

127. Such acts and practices offend public policy and are immoral, unethical, oppressive, and unscrupulous. Additionally, the conduct of the Right Spinal Defendants has been materially injurious to GEICO and its Insureds.

128. The conduct of the Right Spinal Defendants was the actual and proximate cause of the damages sustained by GEICO.

129. The Right Spinal Defendants' unfair and deceptive acts have caused GEICO to sustain damages of at least $1,600,000.00.

130. By reason of the Right Spinal Defendants' conduct, GEICO is also entitled to recover costs and reasonable attorneys' fees pursuant to Fla. Stat. 501.211(2).

### FIFTH CAUSE OF ACTION
**Against Mora-Jimenez, Merced, Duldulao, Silva, Diamantides, Perez, Garcia, and Veliz**
**(Under Fla. Stat. 772.103 et. seq.)**

131. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-89 and 91-96, above.

132. In furtherance of the fraudulent scheme, Mora-Jimenez, Merced, Duldulao, Silva, Diamantides, Perez, Garcia, and Veliz submitted or caused to be submitted thousands of fraudulent

charges through the Right Spinal enterprise to GEICO seeking payment pursuant under automobile insurance policies issued by GEICO to Florida Insureds.

133.    When the billing was submitted, Mora-Jimenez, Merced, Duldulao, Silva, Diamantides, Perez, Garcia, and Veliz knew that the billing contained false and misleading information concerning facts material to the claims for which reimbursement was being sought in that: (i) Right Spinal unlawfully was operated in violation of the Clinic Act's medical director and licensing requirements, and therefore was not eligible to collect PIP Benefits in the first instance; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO, and therefore were not eligible for PIP reimbursement in the first instance; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Right Spinal Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

134.    These knowing and intentional acts constitute a pattern of criminal activity, in that said acts constitute insurance fraud in violation of Fla. Stat. § 817.234(1)(a).

135.    This pattern of criminal activity resulted in Mora-Jimenez, Merced, Duldulao, Silva, Diamantides, Perez, Garcia, and Veliz receiving more than $1,600,000.00 in PIP Benefits to which they were not entitled.

136.    Mora-Jimenez, Merced, Duldulao, Silva, Diamantides, Perez, Garcia, and Veliz's pattern of criminal activity has caused GEICO to sustain damages of at least $1,600,000.00.

137.    By reason of Mora-Jimenez, Merced, Duldulao, Silva, Diamantides, Perez, Garcia, and Veliz's conduct, GEICO is also entitled to recover threefold the actual damages it actually sustained, reasonable attorney's fees, and court costs pursuant to Fla. Stat. § 772.104.

**SIXTH CAUSE OF ACTION**
**Against the Right Spinal Defendants**
**(Common Law Fraud)**

138.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-89 and 91-96, above.

139.    The Right Spinal Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of submitting, or causing to be submitted, thousands of fraudulent charges through Right Spinal for the Fraudulent Services.

140.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that that Right Spinal was in compliance with the Clinic Act and eligible to collect PIP Benefits in the first instance, when in fact Right Spinal never was in compliance with the Clinic Act, and never was eligible to collect PIP Benefits, because it was operated without a legitimate medical director; (ii) in every claim, the representation that the Fraudulent Services were lawfully provided and eligible for PIP reimbursement, when in fact the Fraudulent Services were not lawfully provided, and were not eligible for PIP reimbursement; (iii) in every claim, the representation that the Fraudulent Services were medically necessary, when in fact they were not medically necessary; and (iv) in many claims, the representation that the Fraudulent Services actually were performed, when in many cases they were not actually performed.

141.     The Right Spinal Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Right Spinal that were not reimbursable.

142.     GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,600,000.00 pursuant to the fraudulent bills that were submitted or caused to be submitted by the Right Spinal Defendants through Right Spinal.

143.     The Right Spinal Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

144.     Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## SEVENTH CAUSE OF ACTION
### Against the Right Spinal Defendants
### (Unjust Enrichment)

145.     GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1-89 and 91-96, above.

146.     As set forth above, the Right Spinal Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

147.     When GEICO paid the bills and charges submitted or caused to be submitted by the Right Spinal Defendants through Right Spinal, it reasonably believed that it was legally obligated to make such payments based on the Right Spinal Defendants' improper, unlawful, and/or unjust acts.

148.    The Right Spinal Defendants have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that the Right Spinal Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

149.    The Right Spinal Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

150.    By reason of the above, the Right Spinal Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $1,600,000.00.

<div align="center">

**EIGHTH CAUSE OF ACTION**
**Against Dominguez and Merced**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

</div>

151.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-79 and 85-96, above.

152.    Caribe Health is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

153.    Dominguez and Merced knowingly have conducted and/or participated, directly or indirectly, in the conduct of Caribe Health's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over two years seeking payments that Caribe Health was not eligible to receive under the No-Fault Law because: (i) Caribe Health unlawfully was operated in violation of the Clinic Act's medical director and licensing requirements; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the

Caribe Health Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

154.    A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2".

155.    Caribe Health's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Dominguez and Merced operated Caribe Health, inasmuch as Caribe Health was not engaged in a legitimate healthcare practice, and acts of mail fraud therefore were essential in order for Caribe Health to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Caribe Health Defendants continue to attempt collection on the fraudulent billing submitted through Caribe Health to the present day.

156.    Caribe Health is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Caribe Health in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

157.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $370,000.00 pursuant to the fraudulent bills submitted through the Caribe Health enterprise.

158.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### NINTH CAUSE OF ACTION
**Against Dominguez, Merced, and Chirino**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

159.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-79 and 85-96, above.

160.    Caribe Health is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

161.    Dominguez, Merced, and Chirino are employed by or associated with the Caribe Health enterprise.

162.    Dominguez, Merced, and Chirino knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of Caribe Health's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over two years seeking payments that Caribe Health was not eligible to receive under the No-Fault Law because: (i) Caribe Health unlawfully was operated in violation of the Clinic Act's medical director and licensing requirements; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Caribe Health Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent

Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

163.     A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2". Each such mailing was made in furtherance of the mail fraud scheme.

164.     Dominguez, Merced, and Chirino knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other automobile insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

165.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $370,000.00 pursuant to the fraudulent bills submitted through the Caribe Health enterprise.

166.     By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### TENTH CAUSE OF ACTION
**Against the Caribe Health Defendants**
**(Under Fla. Stat. 501.201 <u>et</u>. <u>seq</u>.)**

167.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-79 and 85-96, above.

168.     The Caribe Health Defendants are actively engaged in trade and commerce in the State of Florida.

169.     GEICO and its Insureds are "consumers" as defined by Fla. Stat. 501.203.

170.    The Caribe Health Defendants engaged in unfair, deceptive, and unconscionable acts or trade practices in their trade or commerce in the pursuit and execution of their scheme to illegally obtain PIP Benefits from GEICO.

171.    The bills and supporting documents submitted or caused to be submitted by the Caribe Health Defendants to GEICO were fraudulent in that they misrepresented: (i) Caribe Health's eligibility to collect PIP Benefits in the first instance; (ii) that the Fraudulent Services were lawfully provided and billed to GEICO; (iii) that the Fraudulent Services were medically necessary; and (iv) that the Fraudulent Services actually were performed in the first instance.

172.    Such acts and practices offend public policy and are immoral, unethical, oppressive, and unscrupulous.  Additionally, the conduct of the Caribe Health Defendants has been materially injurious to GEICO and its Insureds.

173.    The conduct of the Caribe Health Defendants was the actual and proximate cause of the damages sustained by GEICO.

174.    The Caribe Health Defendants' unfair and deceptive acts have caused GEICO to sustain damages of at least $370,000.00.

175.    By reason of the Caribe Health Defendants' conduct, GEICO is also entitled to recover costs and reasonable attorneys' fees pursuant to Fla. Stat. 501.211(2).

<div align="center">

**ELEVENTH CAUSE OF ACTION**
**Against Dominguez, Merced, and Chirino**
**(Under Fla. Stat. 772.103 <u>et</u>. <u>seq</u>.)**

</div>

176.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-79 and 85-96, above.

177.    In furtherance of the fraudulent scheme, Dominguez, Merced, and Chirino submitted or caused to be submitted thousands of fraudulent charges through the Caribe Health

enterprise to GEICO seeking payment pursuant under automobile insurance policies issued by GEICO to Florida Insureds.

178.    When the billing was submitted, Dominguez, Merced, and Chirino knew that the billing contained false and misleading information concerning facts material to the claims for which reimbursement was being sought in that: (i) Caribe Health unlawfully was operated in violation of the Clinic Act's medical director and licensing requirements, and therefore was not eligible to collect PIP Benefits in the first instance; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO, and therefore were not eligible for PIP reimbursement in the first instance; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Caribe Health Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

179.    These knowing and intentional acts constitute a pattern of criminal activity, in that said acts constitute insurance fraud in violation of Fla. Stat. § 817.234(1)(a).

180.    This pattern of criminal activity resulted in Dominguez, Merced, and Chirino receiving more than $370,000.00 in PIP Benefits to which they were not entitled.

181.    Dominguez, Merced, and Chirino's pattern of criminal activity has caused GEICO to sustain damages of at least $370,000.00.

182.    By reason of Dominguez, Merced, and Chirino's conduct, GEICO is also entitled to recover threefold the actual damages it actually sustained, reasonable attorney's fees, and court costs pursuant to Fla. Stat. § 772.104.

**TWELFTH CAUSE OF ACTION**
**Against the Caribe Health Defendants**
**(Common Law Fraud)**

183.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-79 and 85-96, above.

184.    The Caribe Health Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of submitting, or causing to be submitted, thousands of fraudulent charges through Caribe Health for the Fraudulent Services.

185.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that that Caribe Health was in compliance with the Clinic Act and eligible to collect PIP Benefits in the first instance, when in fact Caribe Health never was in compliance with the Clinic Act, and never was eligible to collect PIP Benefits, because it was operated without a legitimate medical director; (ii) in every claim, the representation that the Fraudulent Services were lawfully provided and billed to GEICO and eligible for PIP reimbursement, when in fact the Fraudulent Services were not lawfully provided or billed to GEICO, and were not eligible for PIP reimbursement; (iii) in every claim, the representation that the Fraudulent Services were medically necessary, when in fact they were not medically necessary; and (iv) in many claims, the representation that the Fraudulent Services actually were performed, when in many cases they were not actually performed.

186.    The Caribe Health Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Caribe Health that were not reimbursable.

187.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $370,000.00 pursuant to the fraudulent bills that were submitted or caused to be submitted by the Caribe Health Defendants through Caribe Health.

188.    The Caribe Health Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

189.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## THIRTEENTH CAUSE OF ACTION
### Against the Caribe Health Defendants
### (Unjust Enrichment)

190.    GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1-79 and 85-96, above.

191.    As set forth above, the Caribe Health Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

192.    When GEICO paid the bills and charges submitted or caused to be submitted by the Caribe Health Defendants through Caribe Health, it reasonably believed that it was legally obligated to make such payments based on the Caribe Health Defendants' improper, unlawful, and/or unjust acts.

193.     The Caribe Health Defendants have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that the Caribe Health Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

194.     The Caribe Health Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

195.     By reason of the above, the Caribe Health Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $370,000.00.

<div align="center">

**FOURTEENTH CAUSE OF ACTION**
**Against Lopez and Merced**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

</div>

196.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-79, 85-89, and 91-96, above.

197.     Park Place Therapy is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

198.     Lopez and Merced knowingly have conducted and/or participated, directly or indirectly, in the conduct of Park Place Therapy's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over three and a half years seeking payments that Park Place Therapy was not eligible to receive under the No-Fault Law because: (i) Park Place Therapy unlawfully was operated in violation of the Clinic Act's medical director and licensing requirements; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols

designed solely to financially enrich the Park Place Therapy Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

199.    A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "3".

200.    Park Place Therapy's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Lopez and Merced operated Park Place Therapy, inasmuch as Park Place Therapy was not engaged in a legitimate healthcare practice, and acts of mail fraud therefore were essential in order for Park Place Therapy to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Park Place Therapy Defendants continue to attempt collection on the fraudulent billing submitted through Park Place Therapy to the present day.

201.    Park Place Therapy is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Park Place Therapy in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

202.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $400,000.00 pursuant to the fraudulent bills submitted through the Park Place Therapy enterprise.

203.     By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

<div style="text-align:center">

**FIFTEENTH CAUSE OF ACTION**
**Against Lopez, Merced, and Gonzalez**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

</div>

204.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-79, 85-89, and 91-96, above.

205.     Park Place Therapy is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

206.     Lopez, Merced, and Gonzalez are employed by or associated with the Park Place Therapy enterprise.

207.     Lopez, Merced, and Gonzalez knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of Park Place Therapy's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over three and a half years seeking payments that Park Place Therapy was not eligible to receive under the No-Fault Law because: (i) Park Place Therapy unlawfully was operated in violation of the Clinic Act's medical director and licensing requirements; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; (iii) the underlying Fraudulent Services were not medically

necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Park Place Therapy Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

208.    A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "3". Each such mailing was made in furtherance of the mail fraud scheme.

209.    Lopez, Merced, and Gonzalez knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other automobile insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

210.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $400,000.00 pursuant to the fraudulent bills submitted through the Park Place Therapy enterprise.

211.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## SIXTEENTH CAUSE OF ACTION
### Against the Park Place Therapy Defendants
### (Under Fla. Stat. 501.201 et. seq.)

212.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-79, 85-89, and 91-96, above.

213.    The Park Place Therapy Defendants are actively engaged in trade and commerce in the State of Florida.

214.    GEICO and its Insureds are "consumers" as defined by Fla. Stat. 501.203.

215.    The Park Place Therapy Defendants engaged in unfair, deceptive, and unconscionable acts or trade practices in their trade or commerce in the pursuit and execution of their scheme to illegally obtain PIP Benefits from GEICO.

216.    The bills and supporting documents submitted or caused to be submitted by the Park Place Therapy Defendants to GEICO were fraudulent in that they misrepresented: (i) Park Place Therapy's eligibility to collect PIP Benefits in the first instance; (ii) that the Fraudulent Services were lawfully provided and billed to GEICO; (iii) that the Fraudulent Services were medically necessary; and (iv) that the Fraudulent Services actually were performed in the first instance.

217.    Such acts and practices offend public policy and are immoral, unethical, oppressive, and unscrupulous.  Additionally, the conduct of the Park Place Therapy Defendants has been materially injurious to GEICO and its Insureds.

218.    The conduct of the Park Place Therapy Defendants was the actual and proximate cause of the damages sustained by GEICO.

219.    The Park Place Therapy Defendants' unfair and deceptive acts have caused GEICO to sustain damages of at least $400,000.00.

220.    By reason of the Park Place Therapy Defendants' conduct, GEICO is also entitled to recover costs and reasonable attorneys' fees pursuant to Fla. Stat. 501.211(2).

<div align="center">

**SEVENTEENTH CAUSE OF ACTION**
**Against Lopez, Merced, and Gonzalez**
**(Under Fla. Stat. 772.103 et. seq.)**

</div>

221.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-79, 85-89, and 91-96, above.

222.    In furtherance of the fraudulent scheme, Lopez, Merced, and Gonzalez submitted or caused to be submitted thousands of fraudulent charges through the Park Place Therapy enterprise to GEICO seeking payment pursuant under automobile insurance policies issued by GEICO to Florida Insureds.

223.    When the billing was submitted, Lopez, Merced, and Gonzalez knew that the billing contained false and misleading information concerning facts material to the claims for which reimbursement was being sought in that: (i) Park Place Therapy unlawfully was operated in violation of the Clinic Act's medical director and licensing requirements, and therefore was not eligible to collect PIP Benefits in the first instance; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO, and therefore were not eligible for PIP reimbursement in the first instance; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Park Place Therapy Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

224.     These knowing and intentional acts constitute a pattern of criminal activity, in that said acts constitute insurance fraud in violation of Fla. Stat. § 817.234(1)(a).

225.     This pattern of criminal activity resulted in Lopez, Merced, and Gonzalez receiving more than $400,000.00 in PIP Benefits to which they were not entitled.

226.     Lopez, Merced, and Gonzalez's pattern of criminal activity has caused GEICO to sustain damages of at least $400,000.00.

227.     By reason of Lopez, Merced, and Gonzalez's conduct, GEICO is also entitled to recover threefold the actual damages it actually sustained, reasonable attorney's fees, and court costs pursuant to Fla. Stat. § 772.104.

<div align="center">

**EIGHTEENTH CAUSE OF ACTION**
**Against the Park Place Therapy Defendants**
**(Common Law Fraud)**

</div>

228.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-79, 85-89, and 91-96, above.

229.     The Park Place Therapy Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of submitting, or causing to be submitted, hundreds of fraudulent charges through Park Place Therapy for the Fraudulent Services.

230.     The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that that Park Place Therapy was in compliance with the Clinic Act and eligible to collect PIP Benefits in the first instance, when in fact Park Place Therapy never was in compliance with the Clinic Act, and never was eligible to collect PIP Benefits, because it was operated without a legitimate medical director; (ii) in every claim, the representation that the Fraudulent Services were lawfully provided and billed to GEICO

<div align="center">54</div>

and eligible for PIP reimbursement, when in fact the Fraudulent Services were not lawfully provided or billed to GEICO, and were not eligible for PIP reimbursement; (iii) in every claim, the representation that the Fraudulent Services were medically necessary, when in fact they were not medically necessary; and (iv) in many claims, the representation that the Fraudulent Services actually were performed, when in many cases they were not actually performed.

231.    The Park Place Therapy Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Park Place Therapy that were not reimbursable.

232.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $400,000.00 pursuant to the fraudulent bills that were submitted or caused to be submitted by the Park Place Therapy Defendants through Park Place Therapy.

233.    The Park Place Therapy Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

234.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### NINETEENTH CAUSE OF ACTION
**Against the Park Place Therapy Defendants**
**(Unjust Enrichment)**

235.    GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1-79, 85-89, and 91-96, above.

236.     As set forth above, the Park Place Therapy Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

237.     When GEICO paid the bills and charges submitted or caused to be submitted by the Park Place Therapy Defendants through Park Place Therapy, it reasonably believed that it was legally obligated to make such payments based on the Park Place Therapy Defendants' improper, unlawful, and/or unjust acts.

238.     The Park Place Therapy Defendants have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that the Park Place Therapy Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

239.     The Park Place Therapy Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

240.     By reason of the above, the Park Place Therapy Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $400,000.00.

241.     Based upon the Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

## TWENTIETH CAUSE OF ACTION
### Against Ulloa, Rodriguez, and Merced
### (Violation of RICO, 18 U.S.C. § 1962(c))

242.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-79, 85-89, and 91-96, above.

243.     Therapy Tampa is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

244. Ulloa, Rodriguez, and Merced knowingly have conducted and/or participated, directly or indirectly, in the conduct of Therapy Tampa's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over two years seeking payments that Therapy Tampa was not eligible to receive under the No-Fault Law because: (i) Therapy Tampa unlawfully was operated in violation of the Clinic Act's medical director and licensing requirements; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Therapy Tampa Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

245. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "4".

246. Therapy Tampa's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Ulloa, Rodriguez, and Merced operated Therapy Tampa, inasmuch as Therapy Tampa was not engaged in a legitimate healthcare practice, and acts of mail fraud therefore were essential in order for Therapy Tampa to function. Furthermore, the intricate

planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Therapy Tampa Defendants continue to attempt collection on the fraudulent billing submitted through Therapy Tampa to the present day.

247.    Therapy Tampa is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Therapy Tampa in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

248.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $440,000.00 pursuant to the fraudulent bills submitted through the Therapy Tampa enterprise.

249.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### TWENTY-FIRST CAUSE OF ACTION
**Against Ulloa, Rodriguez, Merced, and Ramos**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

250.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-79, 85-89, and 91-96, above.

251.    Therapy Tampa is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

252.    Ulloa, Rodriguez, Merced, and Ramos are employed by or associated with the Therapy Tampa enterprise.

253.    Ulloa, Rodriguez, Merced, and Ramos knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of Therapy Tampa's

affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over two years seeking payments that Therapy Tampa was not eligible to receive under the No-Fault Law because: (i) Therapy Tampa unlawfully was operated in violation of the Clinic Act's medical director and licensing requirements; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Therapy Tampa Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

254.    A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "4". Each such mailing was made in furtherance of the mail fraud scheme.

255.    Ulloa, Rodriguez, Merced, and Ramos knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other automobile insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

256.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $440,000.00 pursuant to the fraudulent bills submitted through the Therapy Tampa enterprise.

257.     By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### TWENTY-SECOND CAUSE OF ACTION
### Against the Therapy Tampa Defendants
### (Under Fla. Stat. 501.201 et. seq.)

258.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-79, 85-89, and 91-96, above.

259.     The Therapy Tampa Defendants are actively engaged in trade and commerce in the State of Florida.

260.     GEICO and its Insureds are "consumers" as defined by Fla. Stat. 501.203.

261.     The Therapy Tampa Defendants engaged in unfair, deceptive, and unconscionable acts or trade practices in their trade or commerce in the pursuit and execution of their scheme to illegally obtain PIP Benefits from GEICO.

262.     The bills and supporting documents submitted or caused to be submitted by the Therapy Tampa Defendants to GEICO were fraudulent in that they misrepresented: (i) Therapy Tampa's eligibility to collect PIP Benefits in the first instance; (ii) that the Fraudulent Services were lawfully provided and billed to GEICO; (iii) that the Fraudulent Services were medically necessary; and (iv) that the Fraudulent Services actually were performed in the first instance.

263.     Such acts and practices offend public policy and are immoral, unethical, oppressive, and unscrupulous.   Additionally, the conduct of the Therapy Tampa Defendants has been materially injurious to GEICO and its Insureds.

264.     The conduct of the Therapy Tampa Defendants was the actual and proximate cause of the damages sustained by GEICO.

265.    The Therapy Tampa Defendants' unfair and deceptive acts have caused GEICO to sustain damages of at least $440,000.00.

266.    By reason of the Therapy Tampa Defendants' conduct, GEICO is also entitled to recover costs and reasonable attorneys' fees pursuant to Fla. Stat. 501.211(2).

<div align="center">

**TWENTY-THIRD CAUSE OF ACTION**
**Against Ulloa, Rodriguez, Merced, and Ramos**
**(Under Fla. Stat. 772.103 et. seq.)**

</div>

267.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-79, 85-89, and 91-96, above.

268.    In furtherance of the fraudulent scheme, Ulloa, Rodriguez, Merced, and Ramos submitted or caused to be submitted thousands of fraudulent charges through the Therapy Tampa enterprise to GEICO seeking payment pursuant under automobile insurance policies issued by GEICO to Florida Insureds.

269.    When the billing was submitted, Ulloa, Rodriguez, Merced, and Ramos knew that the billing contained false and misleading information concerning facts material to the claims for which reimbursement was being sought in that: (i) Therapy Tampa unlawfully was operated in violation of the Clinic Act's medical director and licensing requirements, and therefore was not eligible to collect PIP Benefits in the first instance; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO, and therefore were not eligible for PIP reimbursement in the first instance; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Therapy Tampa Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for

the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

270.    These knowing and intentional acts constitute a pattern of criminal activity, in that said acts constitute insurance fraud in violation of Fla. Stat. § 817.234(1)(a).

271.    This pattern of criminal activity resulted in Rodriguez, Merced, and Ramos receiving more than $440,000.00 in PIP Benefits to which they were not entitled.

272.    Ulloa, Rodriguez, Merced, and Ramos's pattern of criminal activity has caused GEICO to sustain damages of at least $440,000.00.

273.    By reason of Ulloa, Rodriguez, Merced, and Ramos's conduct, GEICO is also entitled to recover threefold the actual damages it actually sustained, reasonable attorney's fees, and court costs pursuant to Fla. Stat. § 772.104.

### TWENTY-FOURTH CAUSE OF ACTION
**Against the Therapy Tampa Defendants**
**(Common Law Fraud)**

274.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-79, 85-89, and 91-96, above.

275.    The Therapy Tampa Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of submitting, or causing to be submitted, thousands of fraudulent charges through Therapy Tampa for the Fraudulent Services.

276.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that that Therapy Tampa was in compliance with the Clinic Act and eligible to collect PIP Benefits in the first instance, when in fact Therapy Tampa never was in compliance with the Clinic Act, and never was eligible to collect

PIP Benefits, because it was operated without a legitimate medical director; (ii) in every claim, the representation that the Fraudulent Services were lawfully provided and billed to GEICO and eligible for PIP reimbursement, when in fact the Fraudulent Services were not lawfully provided or billed to GEICO, and were not eligible for PIP reimbursement; (iii) in every claim, the representation that the Fraudulent Services were medically necessary, when in fact they were not medically necessary; and (iv) in many claims, the representation that the Fraudulent Services actually were performed, when in many cases they were not actually performed.

277.   The Therapy Tampa Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Therapy Tampa that were not reimbursable.

278.   GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $440,000.00 pursuant to the fraudulent bills that were submitted or caused to be submitted by the Therapy Tampa Defendants through Therapy Tampa.

279.   The Therapy Tampa Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

280.   Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**TWENTY-FIFTH CAUSE OF ACTION**
**Against the Therapy Tampa Defendants**
**(Unjust Enrichment)**

281.    GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1-79, 85-89, and 91-96, above.

282.    As set forth above, the Therapy Tampa Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

283.    When GEICO paid the bills and charges submitted or caused to be submitted by the Therapy Tampa Defendants through Therapy Tampa, it reasonably believed that it was legally obligated to make such payments based on the Therapy Tampa Defendants' improper, unlawful, and/or unjust acts.

284.    The Therapy Tampa Defendants have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that the Therapy Tampa Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

285.    The Therapy Tampa Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

286.    By reason of the above, the Therapy Tampa Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $440,000.00.

**TWENTY-SIXTH CAUSE OF ACTION**
**Against Reyes and Merced**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

287.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-79, 85-89, and 91-96, above.

288.    Bay Area Health is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

289.    Reyes and Merced knowingly have conducted and/or participated, directly or indirectly, in the conduct of Bay Area Health's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over two years seeking payments that Bay Area Health was not eligible to receive under the No-Fault Law because: (i) Bay Area Health unlawfully was operated in violation of the Clinic Act's medical director and licensing requirements; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Bay Area Health Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

290.    A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "5".

291.    Bay Area Health's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Reyes and Merced operated Bay Area Health, inasmuch as Bay Area Health was not engaged in a legitimate healthcare practice, and acts of mail fraud therefore were essential in order for Bay Area Health to function. Furthermore, the intricate planning required to

carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Bay Area Health Defendants continue to attempt collection on the fraudulent billing submitted through Bay Area Health to the present day.-

292.    Bay Area Health is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Bay Area Health in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

293.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $300,000.00 pursuant to the fraudulent bills submitted through the Bay Area Health enterprise.

294.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

<div align="center">

**TWENTY-SEVENTH CAUSE OF ACTION**
**Against Reyes, Merced, Diaz, and Figueroa**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

</div>

295.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-79, 85-89, and 91-96, above.

296.    Bay Area Health is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

297.    Reyes, Merced, Diaz, and Figueroa are employed by or associated with the Bay Area Health enterprise.

298.    Reyes, Merced, Diaz, and Figueroa knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of Bay Area Health's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over two years seeking payments that Bay Area Health was not eligible to receive under the No-Fault Law because: (i) Bay Area Health unlawfully was operated in violation of the Clinic Act's medical director and licensing requirements; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Bay Area Health Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

299.    A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "5". Each such mailing was made in furtherance of the mail fraud scheme.

300.    Reyes, Merced, Diaz, and Figueroa knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other automobile insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

301.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $300,000.00 pursuant to the fraudulent bills submitted through the Bay Area Health enterprise.

302.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## TWENTY-EIGHTH CAUSE OF ACTION
### Against the Bay Area Health Defendants
### (Under Fla. Stat. 501.201 et. seq.)

303.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-79, 85-89, and 91-96, above.

304.    The Bay Area Health Defendants are actively engaged in trade and commerce in the State of Florida.

305.    GEICO and its Insureds are "consumers" as defined by Fla. Stat. 501.203.

306.    The Bay Area Health Defendants engaged in unfair, deceptive, and unconscionable acts or trade practices in their trade or commerce in the pursuit and execution of their scheme to illegally obtain PIP Benefits from GEICO.

307.    The bills and supporting documents submitted or caused to be submitted by the Bay Area Health Defendants to GEICO were fraudulent in that they misrepresented: (i) Bay Area Health's eligibility to collect PIP Benefits in the first instance; (ii) that the Fraudulent Services were lawfully provided and billed to GEICO; (iii) that the Fraudulent Services were medically necessary; and (iv) that the Fraudulent Services actually were performed in the first instance.

308.     Such acts and practices offend public policy and are immoral, unethical, oppressive, and unscrupulous.   Additionally, the conduct of the Bay Area Health Defendants has been materially injurious to GEICO and its Insureds.

309.     The conduct of the Bay Area Health Defendants was the actual and proximate cause of the damages sustained by GEICO.

310.     The Bay Area Health Defendants' unfair and deceptive acts have caused GEICO to sustain damages of at least $300,000.00.

311.     By reason of the Bay Area Health Defendants' conduct, GEICO is also entitled to recover costs and reasonable attorneys' fees pursuant to Fla. Stat. 501.211(2).

## TWENTY-NINTH CAUSE OF ACTION
### Against Reyes, Merced, Diaz, and Figueroa
### (Under Fla. Stat. 772.103 et. seq.)

312.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-79, 85-89, and 91-96, above.

313.     In furtherance of the fraudulent scheme, Reyes, Merced, Diaz, and Figueroa submitted or caused to be submitted thousands of fraudulent charges through the Bay Area Health enterprise to GEICO seeking payment pursuant under automobile insurance policies issued by GEICO to Florida Insureds.

314.     When the billing was submitted, Reyes, Merced, Diaz, and Figueroa knew that the billing contained false and misleading information concerning facts material to the claims for which reimbursement was being sought in that: (i) Bay Area Health unlawfully was operated in violation of the Clinic Act's medical director and licensing requirements, and therefore was not eligible to collect PIP Benefits in the first instance; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO, and therefore were not eligible for PIP reimbursement

in the first instance; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Bay Area Health Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

315.     These knowing and intentional acts constitute a pattern of criminal activity, in that said acts constitute insurance fraud in violation of Fla. Stat. § 817.234(1)(a).

316.     This pattern of criminal activity resulted in Reyes, Merced, Diaz, and Figueroa receiving more than $300,000.00 in PIP Benefits to which they were not entitled.

317.     Reyes, Merced, Diaz, and Figueroa's pattern of criminal activity has caused GEICO to sustain damages of at least $300,000.00.

318.     By reason of Reyes, Merced, Diaz, and Figueroa's conduct, GEICO is also entitled to recover threefold the actual damages it actually sustained, reasonable attorney's fees, and court costs pursuant to Fla. Stat. § 772.104.

**THIRTIETH CAUSE OF ACTION**
**Against the Bay Area Health Defendants**
**(Common Law Fraud)**

319.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-79, 85-89, and 91-96, above.

320.     The Bay Area Health Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the

course of submitting, or causing to be submitted, thousands of fraudulent charges through Bay Area Health for the Fraudulent Services.

321.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that that Bay Area Health was in compliance with the Clinic Act and eligible to collect PIP Benefits in the first instance, when in fact Bay Area Health never was in compliance with the Clinic Act, and never was eligible to collect PIP Benefits, because it was operated without a legitimate medical director; (ii) in every claim, the representation that the Fraudulent Services were lawfully provided and billed to GEICO and eligible for PIP reimbursement, when in fact the Fraudulent Services were not lawfully provided or billed to GEICO, and were not eligible for PIP reimbursement; (iii) in every claim, the representation that the Fraudulent Services were medically necessary, when in fact they were not medically necessary; and (iv) in many claims, the representation that the Fraudulent Services actually were performed, when in many cases they were not actually performed.

322.    The Bay Area Health Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Bay Area Health that were not reimbursable.

323.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $300,000.00 pursuant to the fraudulent bills that were submitted or caused to be submitted by the Bay Area Health Defendants through Bay Area Health.

324.    The Bay Area Health Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

325.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## THIRTY-FIRST CAUSE OF ACTION
### Against the Bay Area Health Defendants
### (Unjust Enrichment)

326.    GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1-79, 85-89, and 91-96, above.

327.    As set forth above, the Bay Area Health Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

328.    When GEICO paid the bills and charges submitted or caused to be submitted by the Bay Area Health Defendants through Bay Area Health, it reasonably believed that it was legally obligated to make such payments based on the Bay Area Health Defendants' improper, unlawful, and/or unjust acts.

329.    The Bay Area Health Defendants have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that the Bay Area Health Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

330.    The Bay Area Health Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

331.    By reason of the above, the Bay Area Health Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $300,000.00.

## JURY DEMAND

332.   Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

**WHEREFORE**, Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co. demand that a Judgment be entered in their favor:

A.   On the First Cause of Action against Right Spinal, Caribe Health, Park Place Therapy, Therapy Tampa, and Bay Area Health, for a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that Right Spinal, Caribe Health, Park Place Therapy, Therapy Tampa, and Bay Area Health have no right to receive payment for any pending bills submitted to GEICO;

B.   On the Second Cause of Action against Mora-Jimenez and Merced, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $1,600,000.00 together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

C.   On the Third Cause of Action against Mora-Jimenez, Merced, Duldulao, Silva, Diamantides, Perez, Garcia, and Veliz, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $1,600,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

D.   On the Fourth Cause of Action against Right Spinal, Mora-Jimenez, Merced, Duldulao, Silva, Diamantides, Perez, Garcia, and Veliz, compensatory damages in an amount to be determined at trial but in excess of $1,600,000.00, together with costs and reasonable attorneys' fees pursuant to Fla. Stat. 501.211(2);

E.     On the Fifth Cause of Action against Mora-Jimenez, Merced, Duldulao, Silva, Diamantides, Perez, Garcia, and Veliz, compensatory damages in an amount to be determined at trial but in excess of $1,600,000.00, together with treble damages, reasonable attorney's fees, and court costs pursuant to Fla. Stat. 772.104;

F.     On the Sixth Cause of Action against Right Spinal, Mora-Jimenez, Merced, Duldulao, Silva, Diamantides, Perez, Garcia, and Veliz, compensatory damages in an amount to be determined at trial but in excess of $1,600,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

G.     On the Seventh Cause of Action against Right Spinal, Mora-Jimenez, Merced, Duldulao, Silva, Diamantides, Perez, Garcia, and Veliz, more than $1,600,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

H.     On the Eighth Cause of Action against Dominguez and Merced, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $370,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

I.     On the Ninth Cause of Action against Dominguez, Merced, and Chirino, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $370,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

J.     On the Tenth Cause of Action against Caribe Health, Dominguez, Merced, and Chirino, compensatory damages in an amount to be determined at trial but in excess of $370,000.00, together with costs and reasonable attorneys' fees pursuant to Fla. Stat. 501.211(2);

K.      On the Eleventh Cause of Action against Dominguez, Merced, and Chirino, compensatory damages in an amount to be determined at trial but in excess of $370,000.00, together with treble damages, reasonable attorney's fees, and court costs pursuant to Fla. Stat. 772.104;

L.      On the Twelfth Cause of Action against Caribe Health, Dominguez, Merced, and Chirino, compensatory damages in an amount to be determined at trial but in excess of $370,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

M.      On the Thirteenth Cause of Action against Caribe Health, Dominguez, Merced, and Chirino, more than $370,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

N.      On the Fourteenth Cause of Action against Lopez and Merced, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $400,000.00 together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

O.      On the Fifteenth Cause of Action against Lopez, Merced, and Gonzalez, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $400,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

P.      On the Sixteenth Cause of Action against Park Place Therapy, Lopez, Merced, and Gonzalez, compensatory damages in an amount to be determined at trial but in excess of $400,000.00, together with costs and reasonable attorneys' fees pursuant to Fla. Stat. 501.211(2);

Q.      On the Seventeenth Cause of Action against Lopez, Merced, and Gonzalez, compensatory damages in an amount to be determined at trial but in excess of $400,000.00, together with treble damages, reasonable attorney's fees, and court costs pursuant to Fla. Stat. 772.104;

R.      On the Eighteenth Cause of Action against Park Place Therapy, Lopez, Merced, and Gonzalez, compensatory damages in an amount to be determined at trial but in excess of $400,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper; and

S.      On the Nineteenth Cause of Action against Park Place Therapy, Lopez, Merced, and Gonzalez,  more than $400,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper.

T.      On the Twentieth Cause of Action against Ulloa, Rodriguez and Merced, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $440,000.00 together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

U.      On the Twenty-First Cause of Action against Ulloa, Rodriguez Merced, and Ramos, compensatory damages in of GEICO in an amount to be determined at trial but in excess of $440,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

V.      On the Twenty-Second Cause of Action against Therapy Tampa, Ulloa, Rodriguez Merced, and Ramos, compensatory damages in an amount to be determined at trial but in excess of $440,000.00, together with costs and reasonable attorneys' fees pursuant to Fla. Stat. 501.211(2);

W.     On the Twenty-Third Cause of Action against Ulloa, Rodriguez Merced, and Ramos, compensatory damages in an amount to be determined at trial but in excess of $440,000.00, together with treble damages, reasonable attorney's fees, and court costs pursuant to Fla. Stat. 772.104;

X.     On the Twenty-Fourth Cause of Action against Therapy Tampa Ulloa, Rodriguez Merced, and Ramos, compensatory damages in an amount to be determined at trial but in excess of $440,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

Y.     On the Twenty-Fifth Cause of Action against Therapy Tampa, Ulloa, Rodriguez Merced, and Ramos, more than $440,000.00  in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

Z.     On the Twenty-Sixth Cause of Action against Reyes and Merced, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $300,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

AA.    On the Twenty-Seventh Cause of Action against Reyes, Merced, Diaz, and Figueroa, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $300,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

BB.    On the Twenty-Eighth Cause of Action against Bay Area Health, Reyes, Merced, Diaz, and Figueroa, compensatory damages in an amount to be determined at trial but in excess of $300,000.00, together with costs and reasonable attorneys' fees pursuant to Fla. Stat. 501.211(2);

CC.     On the Twenty-Ninth Cause of Action against Reyes, Merced, Diaz, and Figueroa, compensatory damages in an amount to be determined at trial but in excess of $300,000.00, together with treble damages, reasonable attorney's fees, and court costs pursuant to Fla. Stat. 772.104;

DD.     On the Thirtieth Cause of Action against Bay Area Health, Reyes, Merced, Diaz, and Figueroa, compensatory damages in an amount to be determined at trial but in excess of $300,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

EE.     On the Thirty-First Cause of Action against Bay Area Health, Reyes, Merced, Diaz, and Figueroa, more than $300,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

Dated:  August 14, 2020

<div style="margin-left:40%">

*/s/ John P. Marino*
John P. Marino (FBN 814539)
Lindsey R. Trowell (FBN 678783)
Kristen Wenger (FBN 92136)
SMITH, GAMBRELL & RUSSELL, LLP
50 North Laura Street, Suite 2600
Jacksonville, Florida 32202
Phone:  (904) 598-6100
Facsimile:  (904) 598-6204
ltrowell@sgrlaw.com
jmarino@sgrlaw.com
kwenger@sgrlaw.com

Yonatan Bernstein (admitted pro hac vice)
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11550
Phone:  (516) 357-3000
Facsimile:  (516) 357-3333
yonatan.bernstein@rivkin.com

*Attorneys for Plaintiffs*

</div>

## <u>CERTIFICATE OF SERVICE</u>

I certify that on August 14, 2020, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will provide notice and a copy of this Amended Complaint to all counsel of record.

<div align="right">

*/s/ John P. Marino*              
Attorney

</div>